**RICHMOND MEDICAL CENTER FOR WOMEN, et al., Plaintiffs,**

**v.**

**James S. GILMORE, et al., Defendants.**

**No. Civ.A. 3:98CV309.**

United States District Court,
E.D. Virginia,
Richmond Division.

June 25, 1998.

Karen A. Raschke, Macaulay, Lee & Powell, P.C., Richmond, VA, Simon Heller, Bebe J. Anderson, The Center for Reproductive Law & Policy, New York City, for Plaintiffs.

William H. Hurd, Ashley L. Taylor, Jr., Mark L. Earley, Office of the Attorney General, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

The plaintiffs are Virginia physicians, medical clinics, and non-profit corporations (the "plaintiffs") offering reproductive health services and obstetrical and gynecological medical services, including abortions, to women in Charlottesville, Falls Church, Newport News, Norfolk, Richmond, and Roanoke, Virginia, and neighboring counties. The geographic area in which they offer abortion services encompasses a large segment of Virginia's population. The individual and institutional plaintiffs brought this action on their own behalf and on behalf of their patients seeking abortions.

The defendants are the Governor of Virginia and the Commonwealth Attorneys for the County of Albemarle, the County of Fairfax, the City of Newport News, the City of Norfolk, the City of Richmond, and the County of Roanoke. The Governor is responsible for ensuring that the laws of Virginia are faithfully executed and the Commonwealth Attorneys are responsible for enforcing Virginia's criminal statutes.

The plaintiffs filed this civil rights action, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202, seeking a declaration that Chapters 448 and 579 of the 1998 Acts of the General Assembly, Va.Code § 18.2–74.2 (the "Act"), offend the Constitution of the United States in several ways. In particular, the plaintiffs assert that the Act violates a woman's right to privacy under the Due Process Clause of the Fourteenth Amendment and is void for vagueness. They allege also that the Act violates the Equal Protection Clause of the Fourteenth Amendment. The Act, which was passed by the General Assembly in the winter of 1998, and signed by the Governor

on April 13, 1998, is scheduled to take effect on July 1, 1998.[1]

At this time, the plaintiffs seek preliminary injunctive relief. For the reasons set forth below, the motion for a preliminary injunction is granted.

## STATEMENT OF FACTS

### A. The Statute

The Act adds certain provisions "relating to partial birth abortions" to Virginia's extant abortion regulatory statutes. *See* 1998 Va. Acts ch. 448. Section 18.2–74.2(A) is entitled "Partial Birth Abortion Prohibited." Its substantive provisions are that:

A. Notwithstanding the provisions of §§ *18.2–72, 18.2–73* and *18.2–74,* a physician shall not knowingly perform a partial birth abortion that is not necessary to save the life of a mother. A violation of this section shall be punishable as a Class I misdemeanor.[2]

Section 18.2–74.2(D) defines "partial birth abortion" to mean:

an abortion in which the person performing the abortion deliberately and intentionally delivers a living fetus or a substantial portion thereof into the vagina for the purpose of performing a procedure the person knows will kill the fetus, performs the procedure, kills the fetus and completes the delivery.[3]

The statute does not define the terms "deliver," "living fetus," or "a substantial portion thereof."

The term "partial birth abortion" is a term coined by legislators, anti-abortion activists, and the media. It has no accepted medical meaning. The American College of Obstetricians and Gynecologists ("ACOG") has issued a statement of policy to put some form and

---

1. This action was instituted on May 21, 1998, and an Amended Complaint was filed on June 5, 1998. Following accelerated briefing, submissions of exhibits and affidavits, and discovery, an evidentiary hearing on the plaintiffs' request for preliminary injunction was held on June 18, 1998, and the case was argued on June 22, 1998. Considering the expedited schedule and the Act's effective date, the Court concluded that the plaintiffs' request for a Temporary Restraining Order should be denied.

2. A Class I misdemeanor is punishable by a maximum term of imprisonment of 1 year, a fine of not more than $2,500, or both. *See* Va.Code Ann. § 18.2–11 (Michie 1997).

3. Under section 18.2–74.2.(B), a physician charged with an offense under subsection (A) is entitled to review by a medical board respecting his decision "whether the partial birth abortion was necessary to save the life of a mother." Va.Code Ann. § 18.2–74.2(a) (Michie 1997).

content to this otherwise medically unrecognized term. To that end, ACOG has equated the term "partial birth abortion" with a medical procedure known as "intact dilatation and extraction," which is also referred to as "Intact D & X." According to the ACOG statement of policy, an Intact D & X contains all four of the following elements:

1. Deliberate dilatation of the cervix, usually over a sequence of days;

2. Instrumental conversion of the fetus to a footling breech;

3. Breech extraction of the body except-ing the head; and

4. Partial evacuation of the intra cranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

(Amended Compl.Ex. B). According to ACOG, any procedure which does not contain all four elements in sequence is not an Intact D & X.

That part of Virginia's criminal code which defines when and under what circumstances an abortion can be performed lawfully has been in effect since 1975 and is consistent with controlling Supreme Court authority respecting the regulation and proscription of abortion. The first provision in that statutory scheme is Va.Code § 18.2–71, which makes performance of an abortion a felony unless the abortion is otherwise permitted by ensuing code sections. Under Va.Code § 18.2–72, it is lawful to perform an abortion during the first trimester of pregnancy, the only limitation being that it must be performed by a licensed physician. Under Va. Code § 18.2–73, it is lawful to perform an abortion during the second trimester of pregnancy, the only limitations being that the abortion be performed by a licensed physician in a hospital licensed by the State. Under Va.Code § 18.2–74, it is lawful to perform an abortion after the second trimester of pregnancy if: (i) the abortion is performed

in a licensed hospital; (ii) the attending physician and two consulting physicians certify that the "continuation of the pregnancy is likely to result in the death of the woman or substantially and irremediably impair the mental or physical health of the woman"; and (iii) life support measures are available for the product of the abortion in the event of evidence of viability.[4]

The Act now under challenge, to be codified at Va.Code § 18.2–74.2, prohibits a doctor from knowingly performing a "partial birth abortion" that is not necessary to save the life of the mother, notwithstanding the fact that first and second trimester abortions are otherwise readily available with obviously non-burdensome restrictions and that even third trimester abortions are available if necessary to save the life of the mother or to protect her physical or mental health from substantial, irreparable injury. Thus, it is no understatement to assert that the Act will alter rather well-settled Virginia law respecting the performance and receipt of abortion procedures.

The plaintiffs apprehend that the statute is so broad as to encompass two key methods of abortion now performed by the plaintiffs. The parties agree that so-called "medical abortions," which are performed by the administration of drugs during the first 49 to 53 days after the last menstrual period,[5] are not covered by the Act. The plaintiffs also argue that the statute is so vaguely worded as to have the same effect. Finally, they contend that the Act offends the controlling principles that: (i) the State may not, before fetal viability, constitutionally impose an undue burden on a woman's decision to have an abortion; and (ii) that "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Planned Parenthood of South-*

---

**4.** Under Va.Code § 18.2–74.1, if termination of a pregnancy by performing an abortion is necessary to save the life of the woman, none of the proscriptive terms of §§ 18.2–71, –73 or –74 shall apply. Under Virginia law, this section affords the physician the benefit of an affirmative defense. *See Simopoulos v. Com. of Virginia,* 221 Va. 1059, 277 S.E.2d 194 (1981), *aff'd,* 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983).

**5.** There are two methods of measuring the length of a pregnancy. One is to measure from the onset of menses and the other to measure after the last menstrual period ("lmp"). All of the evidence in this case, and hence this opinion, use the lmp method of measurement of the duration of the pregnancy unless otherwise explicitly stated.

eastern Pa. v. Casey, 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). They also argue that, in failing to provide a maternal health exception, the Act violates the rule in Casey regulating such an exception after viability.

These challenges to the Act can be assessed only in the context of the record respecting the various means of performing abortions and the means used by the physicians and clinics who are plaintiffs in this action.

## B. Abortion Methods

·There are several undisputed facts which are of significance in understanding abortion methods and the issues presented by the Act. First, it is undisputed that the purpose of an abortion is to terminate a pregnancy and that the abortion procedure kills the fetus. Nor is it disputed that the plaintiff physicians and the employees of the institutional plaintiffs who perform abortions do so with the knowledge and intent that, in terminating the pregnancy, the fetus will be killed.

Also, it is undisputed that, in most medically acceptable methods of abortions, the fetus is removed from the uterus, through the cervical canal and cervical os, into and through the vagina, either intact or in parts. In some methods of abortion in the first and second trimester, the fetus is brought from the uterus to the vagina in a syringe or through a cannula.

There is no dispute that the term "viability" means "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb." Casey, 505 U.S. at 870, 112 S.Ct. 2791. The parties are in agreement that, generally, viability occurs between 23 and 25 weeks lmp. Also, it is agreed that, in medical parlance, sustained cardiac activity over a period of time at a set rate evinces the existence of life in the fetus; that this occurs usually at 10 weeks lmp; that fetal tissue may be alive in some sense of the word before 10 weeks lmp; and that "life" in the fetus and viability are different concepts.

With these facts in mind, it is now appropriate to describe the basic methods of abortion. The most reliable evidence on the methods of abortion came from Dr. Hausknecht, Dr. Jones, and Dr. Fitzhugh, each of whom is board certified in obsetretics and gynecology, a member of ACOG, a teacher of medicine, including abortion, at respected facilities, and an expert in the area of abortions.[6] Dr. Hausknecht has performed approximately 5,000 abortions. Drs. Fitzhugh and Jones have performed approximately 100,000 and 30,000 abortions, respectively. Drs. Hausknecht and Fitzhugh also are medical directors of abortion clinics.

### 1. Medical Abortions

At the very earliest stage of pregnancy, e.g., 49 to 53 days lmp, Drs. Fitzhugh and Jones use medications to induce abortions in a small percentage of their patients, estimated to be at approximately 1%.

### 2. Suction Curettage: The Most Common First Trimester Method

Generally, the method of abortion used through approximately 13 weeks lmp is known as suction curettage or vacuum aspiration. In this procedure, the doctor mechanically dilates the cervix with metal rods and removes the embryo or the fetus by means of negative suction. To do this, the physician inserts a tube or cannula, which is attached to a vacuum generator, through the vagina into the uterus. Suction curettage can be used on occasion as late as 15 weeks lmp.

As is true with all methods of abortions, different physicians use different techniques and methods. For example, for abortions between 8 to 10 weeks lmp through the 13th week lmp, Dr. Fitzhugh often finds it necessary to use forceps to grasp part of the fetus and remove it from the uterus. Of course, when this occurs, the removed parts pass into and through the vagina via the cannula. It is undisputed that most often the fetus has cardiac activity and hence is living at the outset of the suction curettage procedure but

6. These three witnesses have more, and more current, experience than the witnesses whose testimony was presented by affidavit by the defendants. Dr. Aultman's testimony evinced that she is not current on the medical aspects of abortion; indeed, she performed her last abortion in 1982.

that generally no effort is made to determine whether the fetus is or is not living. However, the fetus unquestionably is killed when removed from the uterus or during the suction curettage procedure.

During the first trimester, the fetal tissue is soft, and because the suction is powerful, suction curettage often results in the removal of fetal parts (such as a limb, the head, or the body) without removal of the entire fetus. If this occurs, the part of the fetus remaining in the uterus can be living because fetal tissue would not necessarily die upon removal of a limb.

At approximately 13 to 15 weeks lmp, suction curettage tends to become less efficacious because the fetal tissue is stronger. Consequently, suction curettage becomes a much slower procedure, thereby resulting in greater maternal blood loss. In that regard, it is generally accepted as a medical proposition that the safety of an abortion is a function of the speed at which the procedure can be performed because the risk of complication and death during any abortion procedure increases with the amount of time consumed by the procedure.

### 3. Dilatation and Evacuation ("D & E"): The Most Common Second Trimester Method [7]

The second trimester begins at approximately the 13th week lmp. Currently, most abortions in the second trimester are accomplished by using the dilatation and evacuation ("D & E") method. D & E is an accepted and widely used method of abortion from 13 to 20 or 21 weeks lmp. D & E abortions account for approximately 96% of post-first trimester abortions nationally.

As explained in *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 198 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998):

> The suction curettage procedure alone is no longer feasible at this point in a woman's pregnancy, because the fetus is too large to remove by use of suction only. In the D & E procedure, the physician inserts laminaria into the pregnant woman's cervix

in order to dilate the cervix; laminaria takes about one to two days to accomplish dilation. Once the woman's cervix is dilated, a suction curette of larger diameter than that used in the suction curettage procedure is placed through the cervix and into the uterus. With the suction curette, the physician can remove some or all of the fetal tissue. However, the torso and the head of the fetus often cannot be removed using the suction curette. Therefore, the D & E procedure typically entails dismembering the fetus, beginning with the extremities, by means of suction curettage and forceps. The most difficult part of the D & E procedure is the removal of the fetal head from the woman's uterus, because it is often too large to fit through the partially dilated cervix.

In Virginia, second trimester abortions must be accomplished in hospitals. The procedure begins with a medical evaluation and an ultrasound examination. On the day before the procedure, the process of dilation begins by inserting osmodic dilators, such as laminaria, one of which is seaweed. By absorbing moisture from the surrounding cervical tissue, the dilators expand and thereby expand the cervix. The next step is to take the patient, on the following day, to the operating room. A spaculum is inserted into the vagina, the dilators are removed and the fetus and other products of conception are removed by using a combination of suction curettage and forceps. Often, the skull (calvarium) is too large to pass through the cervix whole and the physician must compress it to complete the abortion. As a general proposition, the fetus is removed in parts, but often it can be removed intact.

Dr. Fitzhugh generally attempts to pull the umbilical cord out first and severs it while it is in the vagina.[8] This, of course, kills the fetus. Sometimes while performing a D & E abortion, Dr. Fitzhugh will extract a limb from the cervix into the vagina and pulls the limb from the torso. This procedure also ultimately kills the fetus. Indeed, these two

---

**7.** The medical term is "dilatation." The vernacular, particularly in judicial opinions, is "dilation." The terms seem to be used interchangeably and they will be so used here.

**8.** This method of performing the procedure is relevant because the plaintiffs and their expert all testified, and the Court accepts, that the umbilical cord is a part of the fetus.

techniques are deliberately attempted by Dr. Fitzhugh in performing D & E abortions from 13 to 21 weeks lmp.

Also, on occasion during a D & E abortion, part of the fetus will spontaeously prolapse from the cervical os into the vagina after the physician ruptures the amniotic membrane. At this point, the fetus still has a heartbeat.

### 4. The Induction Method[9]

The only safe and routinely performed alternative to D & E after approximately 15 weeks is the induction abortion which accounts for approximately 4% of post-first trimester abortions nationwide. In this form of abortion, the physician induces labor by using one of several chemicals. The chemical can be injected into the amniotic sack, the vagina, the cervix, a vein, or a muscle. Although in this method of abortion labor is induced before term, an induction abortion involves the same physiological stress, emotional stress, medical complications, and risks as does labor and delivery at term.

### 5. Surgical Alternatives: Hysterotomy and Hysterectomy

It is also possible to terminate pregnancy by using a hysterotomy or a hysterectomy, both of which are surgical procedures. A hysterotomy is a cesarean section accomplished before term; however, it involves even more blood loss and other damage than does a cesarean section because the uterus is thicker than at term. A hysterectomy is the removal of a uterus and, of course, leaves a woman permanently sterile. Unsurprisingly, these procedures are rarely used as abortion methods largely because of the associated rates of maternal mortality and morbidity which are many times greater than either D & E or induction.

### 6. The Intact Dilatation and Extraction ("D & X") Method

Much of the evidence in this record relates to a method of abortion described earlier as the Intact D & X, sometimes referred to as an Intact D & E. Hereafter, this opinion will use the term "D & X." Although Dr. Jones testified that, in one form or another, D & X abortions have been known in this country for at least 100 years, and in civilizations outside of this country for more than 1,000 years, the procedure assumed great prominence in this country by virtue of a presentation made by Dr. Martin Haskell, an Ohio obstetrician, in September 1992. As a general proposition, D & X is a variant of D & E but "differs from classic D & E in that it [D & X] does not rely upon dismemberment to remove the fetus." (Defs.' Mem. Law Opp'n Pls.' Mot. T.R.O. and Prelim. Inj. Ex. 23, at 1 ("Defs.' Mem.").) Dr. Haskell "coined the term dilation and extraction or D & X to distinguish it from dismemberment-type D & E's." (Id.) According to Dr. Haskell, "most surgeons find dismemberment at twenty weeks and beyond to be difficult due to the toughness of fetal tissues at this stage of development." (Id. at 2.)

The D & X procedure takes place over three days. The first day involves evaluation and ultrasound testing and the placement of dilators. The next day, the patient is placed in an operating room where the dilating materials are removed and additional dilation is placed in the cervical canal. The operation occurs on the third day. The dilators are removed; a drug is administered intramuscularly; the physician pulls a lower extremity into the vagina and then uses his fingers to deliver the lower extremity and then the torso followed by the shoulders and the upper extremities. At that point, the skull is lodged at the internal cervical os. Usually the dilation is insufficient for the skull to pass through. At that point, the surgeon slides his or her fingers along the back of the fetus; uses a pair of blunt curved scissors to rupture the base of the skull; and uses a suction catheter to evacuate the contents of the skull and then applies traction to the fetus to remove it from the patient. As mentioned earlier, the ACOG described the procedure slightly differently, but generally in the same fashion. (Pls.' Mem. Supp. Mot. T.R.O. and Prelim. Inj. Ex. B ("Pls.' Mem.").) The AMA describes essentially the same procedure as an Intact D & E. (Defs.' Mem. Ex. 20.)

9. There is a method called instillation which is not used generally today and is not used at all by any plaintiff. It will not be discussed.

### 7. Relative Safety of The Various Methods

It is generally accepted that abortion carries a lesser risk of mortality and morbidity than does carrying a pregnancy to term. It is also not disputed that generally the D & E abortion is the safest method of abortion for second trimester fetuses. Induction of labor carries higher risks to the patient than does D & E. Nor is it disputed that hysterotomy and hysterectomy carry far greater risks than an abortion by D & E.

### DISCUSSION

#### A. Standing

 Before addressing the merits of the action, it is necessary to resolve the defendants' argument that the plaintiffs lack standing to bring this action. Of course, the plaintiffs' constitutional challenge to the Act must present a "case or controversy" before the Court has jurisdiction. U.S. Const. Art. III, § 2. To that end, the plaintiffs must establish that: (1) they personally have suffered some actual or threatened injury as a result of the allegedly illegal conduct; (2) the injury fairly can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision by the federal court. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Or, as the Supreme Court has explained: "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); see also Doe v. Duling, 782 F.2d 1202, 1205 (4th Cir.1986).

 The Supreme Court has emphasized, however, that " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " Babbitt, 442 U.S. at 298, 99 S.Ct. 2301 (quoting Pennsylvania v. West Va., 262 U.S. 553, 593,

43 S.Ct. 658, 67 L.Ed. 1117 (1923)). It is not necessary, therefore, for the plaintiffs to expose themselves first to potential arrest or prosecution before proceeding with a challenge to the statute in federal court. See id. 442 U.S. at 298, 99 S.Ct. 2301. For example, in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Supreme Court held that: (i) physicians challenging the constitutionality of state abortion statutes had standing "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution"; and (ii) the plaintiff physicians "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." Id. at 188, 93 S.Ct. 739.

 In sum, to fulfill the standing requirement in challenging the constitutionality of a criminal statute, the plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." Babbitt, 442 U.S. at 298, 99 S.Ct. 2301. A credible threat must be more than merely imaginary or speculative, and must be both real and immediate, not conjectural or hypothetical. See id. at 298, 99 S.Ct. 2301; O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

The defendants argue that the plaintiffs cannot establish an actual or threatened injury as a result of their conduct because none of the physicians or clinics perform the D & X procedure. And, it is undisputed that none of the plaintiffs perform the D & X procedure. The defendants then point to the various affidavits from the Commonwealth Attorney defendants, and the opinion of the Attorney General, for the proposition that the only prosecutions under this statute will be taken against physicians and hospitals who perform the D & X procedure.[10] Thus, the defendants contend that there is no "real and immediate" threat of prosecution, but only a conjectural and speculative fear of prosecution that is insufficient to provide the plaintiffs with standing in this action. That argument is, however, wrong.

---

**10.** (See Defs.' Mem. Exs. 2–7, ¶ 5(c) (stating that "[b]ased upon my reading of the Act, ... [t]he Act does not prohibit suction curettage abortions, drug-induced abortions, or conventional D & E abortions," and that physicians who perform these abortions "within my jurisdiction will not be prosecuted under the Act for performing such abortions").)

The plaintiffs, through the physicians' affidavits and sworn testimony, allege that they fear prosecution for the performance of their abortion services, including the D & E procedure.[11] The plaintiffs assert that the Act is written so broadly and vaguely that a prosecutor could interpret the Act to include the procedures these physicians perform such as the suction curettage and D & E, as the plaintiffs perform them. Hence, the plaintiffs fear prosecution and the loss of their medical license to practice if they continue performing abortions in their normal course of practice. (*See* Jones Decl. ¶¶ 25, 27.)

The plaintiffs' affidavits and the hearing testimony explain that, in performing a D & E, a physician may intentionally "deliver" a still-attached fetal limb into the vaginal canal before the limb is detached, or that, on occasion, the fetus may be removed through the cervix intact, which would constitute a "substantial" portion of the fetus. (*See* Fitzhugh Decl. ¶¶ 12, 23; deProsse Decl. ¶¶ 28, 71; Hausknecht Decl. ¶ 17.) At the hearing, Dr. Fitzhugh testified that there are circumstances in performing D & E's where the cervix is dilated to a greater capacity, so that all the physician needs to do is grasp the fetus, remove it through the vagina, and then separate the umbilical cord and remove the placenta. (*See* Hearing Tr. at 128.) Further, Dr. Jones testified that, in performing a suction curettage, the intact fetus may come through the cannula, which is inserted in the vagina. (*Id.* at 164). Thus, the evidence shows that the procedures, as performed by plaintiffs, can fall within the Act.

Moreover, contrary to the defendants' argument, the threat of prosecution is not rendered hypothetical or speculative because of the Attorney General's opinion or the Commonwealth Attorneys' affidavits. First, the Supreme Court has made it clear that the Attorney General does not bind the state courts or local law enforcement authorities, and that an Attorney General's interpretation

of a state statute is not "authoritative." *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 395, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The Supreme Court also has made clear that it is no defense to a constitutional vagueness challenge to a statute "to say that a prosecutor's sense of fairness and the Constitution would prevent a successful ... prosecution for some of the activities seemingly embraced within the sweeping statutory definitions. The hazard of being prosecuted ... nevertheless remains.... Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." *Baggett v. Bullitt,* 377 U.S. 360, 373, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *see also Keyishian v. Board of Regents,* 385 U.S. 589, 599, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("It is no answer to say that the statute would not be applied in such a case."). The same principles have equal force here.

The Commonwealth Attorneys' affidavits eschewing prosecution of the plaintiffs for performing so-called "conventional D & E" procedures or suction curettage methods constitute no more than a " 'qualified, equivocal and discretionary present intention not to prosecute' " those procedures. *United Food and Commercial Workers Int'l Union v. IBP, Inc.,* 857 F.2d 422, 429 (8th Cir.1988) (quoting district court finding). Moreover, although the defendants disclaim their current intent not to prosecute these physicians for the procedures which they perform, the defendants clearly did not disavow that they will enforce the Act. In fact, each Commonwealth Attorney specifically articulated an intent to enforce it.

The only barrier to prosecution is the defendants' understanding of the medical procedures which the plaintiffs perform. That is no real barrier because the record makes clear that the defendants misunderstand what the plaintiffs actually do in performing what the Commonwealth Attorneys consider to be "suction curettage and conventional D & E procedures." [12]

---

11. (*See also* Fitzhugh Decl. ¶ ¶ 25–26 ("I fear that if the Act goes into effect, I could risk criminal prosecution and imprisonment whenever I perform an abortion. The Act would also expose me to the risk of losing my license to practice medicine by performing the abortion procedures that I currently use."); Jones Decl. ¶¶ 25, 27.)

12. The defendants argue that the plaintiffs' hearing testimony was at variance with the descriptions of the methods of abortion as stated in the plaintiffs' affidavits. Having considered the hearing testimony and the plaintiffs' affidavits, the Court finds no material difference even though, as is not at all uncommon, the hearing

Finally, the present intention of the Commonwealth Attorneys not to prosecute for these procedures is subject to change because nothing binds the Commonwealth Attorneys to their current personal interpretation of the statute. Nor should they be so bound.

An analogous circumstance was presented in *Summit Medical Associates v. James,* 984 F.Supp. 1404 (M.D.Ala.1998), where the district court considered the effect of the Alabama attorney general's letter to the district attorneys outlining how the partial-birth abortion statute was to be construed for enforcement purposes. *See id.* at 1430. The district court noted that neither the current attorney general, nor any of the successor attorneys general, were bound to the construction of the statute set forth in the letter and thus concluded that "the attorney general is free to change his mind at any time regarding how the statute is to be construed for purposes of prosecuting potential violators." *Id. see also American Booksellers,* 484 U.S. at 395, 108 S.Ct. 636 ("[A]s the Attorney General does not bind the state courts or local law enforcement authorities, we are unable to accept her interpretation of the law as authoritative."). Similarly, the Attorney General's letter here which asserts that "conventional D & E's" are not subject to prosecution under the Act is not binding on him or on the Commonwealth Attorneys who are charged with the enforcement of the statute.

The defendants argue, however, that unlike *Summit Medical,* the record here contains sworn affidavits from the Commonwealth Attorneys stating their interpretation of the statute and their belief that the Act is inapplicable to the physicians' current practices. Those assurances, which reflect a "discretionary present intention not to prosecute," *United Food,* 857 F.2d at 429, do not deprive the plaintiffs of standing. Those assurances are especially vulnerable to change in the context of a criminal abortion statute, given the "unquestionable political nature of decisions regarding how, when, and against whom to enforce such statutes, as well as the acute sensitivity of these decisions to the force and direction of the prevailing winds of

public opinion." *Summit Medical,* 984 F.Supp. at 1431. Moreover, the stated views of the Commonwealth Attorneys respecting interpretation of the statute is particularly subject to change because their assurances in this case are premised on a misunderstanding of how the plaintiffs perform the suction curettage and the D & E procedures.

■ The record establishes that the plaintiffs have asserted "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301. For the foregoing reasons, the plaintiffs have established standing.

**B. Motion for Preliminary Injunctive Relief**

■ The grant of interim injunctive relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1991) (citation omitted). In this circuit, the decision whether to exercise this power is controlled by the hardship balancing test which involves the application of four factors:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

*Id.* at 812 (citations omitted). It is the plaintiffs' responsibility to establish that each of the four factors warrants the exercise of the extraordinary power of injunction. First, the plaintiffs must make a "clear showing of irreparable harm as a condition for the grant of a preliminary injunction," and, the irreparable harm "must be 'neither remote nor speculative, but actual and imminent.'" *Id.* (citations omitted). Unless the plaintiffs

testimony was more detailed and complete than the statements in the affidavits.

prove irreparable injury, the analysis never proceeds further.

 Under the balancing of hardships tests, the second step is to consider the likelihood of harm to the defendants from the grant of injunctive relief and then to balance the likelihood of irreparable harm to the plaintiffs from failing to grant such relief against the likelihood of harm to the defendant if it is granted. *Id.* The third step involves the consideration of success on the merits. In that regard:

> *If,* after balancing those two factors [*i.e.,* irreparable harm to plaintiff against harm to the defendant], *the balance 'tips decidedly' in favor of the plaintiff,* a preliminary injunction will be *granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful,* as to make them *fair ground for litigation* and thus for *more deliberate investigation.'* As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.* at 812–13 (citations omitted) (emphasis added). In other words, if the balance of harm strongly favors the plaintiffs, it is not required that the plaintiffs make a strong showing of likelihood of success on the merits. This is because the hardship balancing test is a "sliding scale" approach and "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Id.* at 813 (citations omitted).

 Therefore, the party seeking an injunction can meet its burden by showing a combination of *probable* success and the *possibility* of irreparable injury or by showing that serious legal questions are raised on the merits and that the balance of hardships is decidedly in his favor. However, the judge ought to require " 'a fairly clear-cut probability of success if he did not find that the harm to the plaintiff outweighed harm to the defendant *to a significant degree.'* " *Id.* (citations omitted) (emphasis in original). Of course, any injunction must be narrowly tailored to fit the circumstances of a particular case and must be no more restrictive than necessary.

Finally, as explained below, when considering the exercise of federal preliminary injunctive power over State statutes must accord a full measure of respect to the citizens of the State and to their laws and institutions.

## 1. Irreparable Harm to Plaintiffs

The plaintiffs and their patients will suffer irreparable injury absent an injunction. First, Dr. Fitzhugh and Dr. Jones perform abortion procedures which come within the interpretation of the Act advanced by the defendants, and which are not excluded from prosecution by the interpretation of the Act proffered by the defendants. Thus, as of July 1, the physicians would face irreparable harm through the threat of criminal prosecution for exercising what they consider to be safe medical judgment in the treatment of their patients and for performing abortions which, under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Casey* they are permitted to perform. Second, harm would befall their patients because the specter of criminal prosecution will cast a chill on the physicians' practice of medicine to such an extent that he would be required to rely on procedures which are medically less safe, or to refer patients out-of-state for the method of abortion which is safest and in their best interests.

### a. Irreparable Injury: Risk of Prosecution

The defendants argue that the plaintiffs cannot suffer irreparable harm because the abortion procedures which they perform are not within the scope of the Act, and thus, that they cannot show they are subject to a threat of criminal prosecution. In sum, the position is that: (1) the plaintiffs do not perform the D & X procedure that is purportedly the only procedure banned by the Act;[13] (2) the Commonwealth Attorneys and Attorney General have issued statements which they interpret to provide that the Act covers the D & X procedure; and (3) the Commonwealth Attorneys and Attorney Gen-

---

13. For purposes of this argument, the defendants take the view that the D & X procedure is the only procedure covered by the Act, notwithstand-

ing that their counsel and an expert witness say that other procedures are covered.

eral have stated that physicians who perform suction curettage abortions, drug-induced abortions, induction abortions, and so-called "conventional D & E" abortions (as the Commonwealth Attorneys define that term) will not be prosecuted under the Act. (Defs.' Mem. Ex. 1, at 2; Exs. 2–7, ¶ 5.)

A comparison of the Commonwealth Attorneys' definitions of a "conventional D & E" abortion with the description of the D & E procedure as performed by the plaintiffs leads to the conclusion that the plaintiffs' method of performing a D & E could be prosecuted under the terms of the Act. The Commonwealth Attorneys all define "conventional D & E" as:

> an abortion procedure technique in which "the physician [after dilating the cervix and removing the dilators] then ruptures the membranes, and dismembers the fetus in the uterine cavity using sharp instruments such as forceps, and suction [and] then removes the fetal parts by pulling them out piece by piece through the cervical os."

(*Id.* Exs. 2–7 ¶ 4(d) (quoting *Evans v. Kelley,* 977 F.Supp. 1283, 1293 (E.D.Mich.1997))). The Attorney General, in his opinion letter, uses the same definition for the "conventional D & E." (*See id.* Ex. 1, at 1.)

In order to circumvent the undisputed fact that the suction curettage and the D & E methods often involve retraction of fetal limbs into the vagina, the Attorney General and the Commonwealth Attorneys have added the interpretive gloss that a conventional D & E "is not transformed into a partial birth abortion within the meaning of the Act by an incidental protrusion of some part of the fetus from the cervical os before fetal death has occurred." (*Id.* Exs. 2–7, ¶ 5(d).)

The plaintiffs' descriptions of the performance of their D & E procedures is materially different from the definitions of that procedure used by the Commonwealth Attorney and Attorney General to define criminally proscribed conduct of medical procedures. Specifically, Dr. Fitzhugh avers that, although he often performs D & E procedures by disjoining the fetus and removing it from the uterus and into the vagina, there are occasions when he is performing this procedure that "the fetus comes through the cervix intact." Indeed, Dr. Fitzhugh would prefer this result because it is safer for his patients. Dr. Hausknecht confirmed that generally it is considered medically more advantageous to the woman's health to remove an intact fetus, rather then dismembering the fetus in utero, because this reduces the risk of uterine perforation or infection from having instruments inside the uterus.[14]

On the occasions when the fetus comes through the cervix intact and is delivered into the vagina, the intact fetus clearly constitutes more than "incidental protrusion" of a limb and, therefore, the interpretive gloss on the definition offered by the Commonwealth Attorneys and Attorney General would not remove this conduct from the Act's proscriptive reach. In addition, the procedure, as performed on occasion by Drs. Fitzhugh and Jones, would not seem to fit the definition of a "conventional D & E" posited by the defendants in which the D & E consists of dismemberment of the fetus inside the uterus, followed by removal "piece by piece." Because the D & E procedure, as performed by the plaintiffs, does not fall within the definition of a procedure that the defendants assert would not be prosecuted, it is quite possible, if not likely, that the plaintiffs could be prosecuted under the Act. Certainly, the Commonwealth Attorneys' affidavits and the Attorney General's interpretation do not foreclose the potential criminal prosecution for performance of this variant of the D & E procedure.[15]

If Dr. Fitzhugh and Dr. Jones were subject to criminal prosecution under the Act, they would be forced to choose between per-

---

14. (*See also* deProsse Decl. ¶¶ 28, 72 (stating that in a D & E procedure, the physician usually removes a fetus in parts, but that sometimes, depending on the individual patient's needs, the fetus may be removed largely intact, which is more beneficial for the woman's health since it "reduces the number of times a physician must insert sharp instruments into the uterus").)

15. That this risk is quite real is illustrated by the fact that counsel for the defendants will not agree that the D & E, as described by the plaintiffs, testimony, would not be covered by the Act.

forming abortions as they currently perform them with the best interest and safety of their patients in mind, and changing their practices, and, therefore, depriving the patients of their right to receive the safest method of abortion. (*See* Fitzhugh Decl. ¶ 33; Jones Decl. ¶ 27.) Given the evidence that it is considered "safer" for the physician to be able to withdraw an intact fetus in conducting a conventional D & E because to do so reduces the number of instruments in the uterus and thus lowers the possibility of uterine perforation, hemorrhaging, and infection, the Act's "chill" on the physician's ability to perform the medically appropriate method of abortion in this manner would result in a less safe performance of an abortion for the patient. That clearly constitutes irreparable injury. (*See* Jones Decl. ¶ 27 ("As a physician, I feel that Virginia's 'partial birth abortion' law puts me in the untenable position of deciding procedures based on whether or not they may be prosecuted, instead of whether they will best protect the health and well being of my patients.").)

The defendants argue that the plaintiffs cannot, as a matter of law, sustain any irreparable injury because the Commonwealth Attorneys have sworn they will not prosecute the performance of abortions by suction curettage or by "conventional D & E" procedures. Those affidavits are a statement of current intent, and are not binding on the Commonwealth Attorneys who subscribed to the definitions and descriptions of these abortion procedures set forth in their affidavits. Of course, the interpretation of the law by those charged with enforcing it is entitled to consideration. But, that interpretation is not binding. *See American Booksellers,* 484 U.S. at 395, 108 S.Ct. 636; *United Food,* 857 F.2d at 429; *Summit Medical,* 984 F.Supp. at 1430. Moreover, the Commonwealth Attorneys, after reading the testimony and evidence in this case, could change their views about which procedures should be prosecuted under the Act, which they are free to do, because these affidavits are non-binding and would not estop the Commonwealth Attorney from pursuing prosecutions. Indeed, the sovereign is not readily subject to estoppel under Virginia law. *See Halberstam v. Cmwlth. of Virginia,* 251 Va. 248, 252, 467 S.E.2d 783, 785 (1996); *Virginia v. Allstate*

*Bonding Co.,* 246 Va. 189, 194, 435 S.E.2d 396, 399 (1993).

Thus, the physicians who perform otherwise lawful abortions in Virginia will suffer irreparable harm because they will be constrained to alter their medical advice to, and their medical care of, their patients, contrary to their best professional medical judgments. Absent a preliminary injunction, the Act will thus chill the plaintiffs' ability to provide safe medical care for their patients who choose, or who are required for medical reasons to obtain, constitutionally protected abortions. *See Brancazio v. Underwood,* No. 2:98–0495 (S.D.W.Va. June 11, 1998); *Little Rock Family Planning v. Jegley,* No. LR–C–97–581 (W.D.Ark. July 31, 1997); *Carhart v. Stenberg,* 972 F.Supp. 507, 531 (D.Neb.1997); *Planned Parhenthood of Central New Jersey v. Verniero,* No. 97–6170 (D.N.J.Decl.16, 1997); *Planned Parenthood of Alaska v. Alaska,* No. 3AN–97–06019 (Alaska Super.Ct. Mar. 13, 1998); *Intermountain Planned Parenthood v. Montana,* No. BDV 97–477 (Mont. First Judicial Dist. Ct., Lewis and Clark County Oct. 1, 1997) (similarly concluding that, absent injunctive relief, the partial birth abortion act would chill a physicians' abilities to provide safe medical care for their patients because of the threat of prosecution and other potential liability).

Second, the patients of these physicians will suffer irreparable injury because they stand to be denied appropriate medical care either because physicians will choose not to treat them at all, or because the physicians will be forced to resort to less safe medical procedures which expose the patients to a greater degree of risk to their health. Dr. Fitzhugh has averred that the threat of criminal prosecution for the procedures he performs under the Act may force him to stop performing abortions altogether. In that eventuality, his patients would be forced to obtain care out-of-state, in which case many women could refuse to have abortions at all because of the travel costs and burdens, while other women would be delayed in having the abortion while they attempted to ascertain whether the procedure could be performed and worked out the necessary arrangements for travel. Because any delay in

abortion increases the risk of the procedure and of harm to the life and health of the woman, a patient faced with these choices will suffer irreparable harm. (*See* Fitzhugh Decl. ¶ 30.) [16]

Dr. Jones considers himself to be in "the impossible position of deciding procedures based on whether or not they may be prosecuted, instead of whether they will best protect the health and well-being of my patients." (Jones Decl. ¶ 27.) Also, he fears that continued use of his current procedures poses this risk. (*See id.*) Any physician in this circumstance would be warranted in adjusting medical treatment to protect against prosecution and the ensuing risk of the loss of the right to practice medicine.

Other courts have imposed temporary restraining orders or preliminary injunctions on similar "partial birth abortion acts" upon finding that the ban would force women to suffer irreparable harm either because other abortion methods are not as safe for their health, or because other abortions methods are unavailable to them. *See Brancazio v. Underwood,* No. 2:98–0495 (S.D.W.Va. June 11, 1998); *Little Rock Family Planning v. Jegley,* No. LR–C–97–581 (W.D.Ark. July 31, 1997); *Carhart,* 972 F.Supp. at 531; *Planned Parenthood of Central N.J. v. Verniero,* No. 97–6170 (D.N.J.Decl.16, 1997); *Women's Med. Prof'l Corp. v. Voinovich,* 911 F.Supp. 1051, 1092 (S.D.Ohio 1995), *aff'd,* 130 F.3d 187 (6th Cir.1997); *Planned Parenthood of Alaska v. Alaska,* No. 3AN–97–06019 (Alaska Super.Ct. Mar. 13, 1998); *Intermountain Planned Parenthood v. Montana,* No. BDV 97–477 (Mont. First Judicial Dist. Ct., Lewis and Clark County Oct. 1, 1997).

 For the foregoing reasons, the plaintiffs have satisfied the obligation to show immediate irreparable injury within the rule of *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977) and *Direx Israel.* [17]

## 2. Likelihood of Harm to the Defendants

It is now necessary to balance the irreparable harm to the plaintiffs and their patients against the harm to the defendants if the requested relief is granted.

The Supreme Court, in *Roe* and *Casey,* has delineated the State's two interests in regulating abortion: (1) the State's interest in potential life; and (2) the State's interest in protecting maternal health. *See Casey,* 505 U.S. at 877–78, 112 S.Ct. 2791; *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705. The defendants argue that the State will suffer irreparable harm if the Act is enjoined because the State's interests that are served by the Act would be frustrated. The defendants identify five such interests: (1) protecting the individual lives of children who have been partially born; (2) protecting the dignity of human life and society's respect for human life; (3) preserving the integrity of the health care profession; (4) preventing cruelty to living beings; and (5) protecting the lives and health of women.

 A State has a "profound interest in potential life," *Casey,* 505 U.S. at 878, 112 S.Ct. 2791; *Roe,* 410 U.S. at 162, 93 S.Ct. 705, but that interest is counterbalanced by a woman's constitutional liberty interest to terminate her pregnancy. *See Casey,* 505 U.S. at 869–70, 112 S.Ct. 2791. As the Supreme Court held in *Casey,* the woman's liberty interest outweighs the State's interest in potential life at the previability stage in such a way and to such a degree that until viability, a State may only regulate abortion to the extent it does not impose an "undue burden" on a woman's right to terminate her pregnancy. *See id.* at 874, 112 S.Ct. 2791.

There is no doubt that preserving the integrity of the health care profession is a legitimate objective of State government.

**16.** (*See also* deProsse Decl. ¶¶ 24, 75 ("Ready access to the best abortion care is thus critical for women's physical and psychological health. It is likewise essential that in providing care, physicians have discretion to consider the full panoply of safe methods of abortion and to proceed with the method most appropriate for each patient.").)

**17.** The Court recognizes that a finding of irreparable injury to the plaintiffs must "not be based on the ultimate issue of the constitutionality of the statute in question." *Manning v. Hunt,* 119 F.3d 254, 264 (4th Cir.1997). However, as set forth above, this Court concludes that the plaintiffs have demonstrated a link between their constitutional rights and the irreparable injuries they claim, so that this aspect of *Manning* is satisfied. *Id.* at 265.

Nonetheless, that objective plays no significant role in the carefully constructed calculus governing abortion rights which the Supreme Court established in *Roe* and *Casey* and their progeny.

Clearly, the protection of maternal health is a legitimate State concern in that equation. And, although the State has offered affidavits to show that the D & X procedure can pose threats to maternal health, the record contains significant evidence to the contrary. Considering that the plaintiffs do not perform D & X abortions, the evidence on that issue, on both sides, does not address a harm that will be sustained, if at all, before the case can be resolved on its merits.

However, because the Act, as worded and as sometimes interpreted by counsel for the defendants and their expert, Dr. Aultman, includes "more than" the D & X procedure and because the only "more than" shown by the record is suction curettage and the D & E as performed by plaintiffs, the safety of these procedures for the mother's health is highly relevant. Significantly, there is no evidence that those procedures pose such a risk. In any event, because Virginia's extensive abortion regulatory scheme (Va.Code Ann. §§ 18.2–71, –72, –73, and –74) will remain in effect until a decision on the merits in this case, the risk of maternal harm is at best theoretical.

As to the State's proffered interests in fetal life, the arguments of the defendants are based on the premise that neither *Roe* nor *Casey* is controlling of the interests around which those decisions are centered. However, those decisions are controlling and a federal district court may not avoid their impact, anymore than can the State or the plaintiffs. Those decisions have drawn a line at viability and, on either side of it, have put the legitimate interests to be served by virtue of that placement. Hence, the perceived harms to the State's interest in fetal life are not sufficient to tip the balance of hardship in the State's favor or even to significantly even the scales.

To the contrary, when the harm to the defendants is balanced against the plaintiffs' irreparable injury absent the grant of an injunction, the balance "tips decidedly" in favor of the plaintiffs, and thus, this Court should grant a preliminary injunction if " 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberated investigation.' " *Rum Creek Coal Sales v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991) (citations omitted). That issue will be assessed now.

### 3. Likelihood of Success on the Merits

The plaintiffs allege that they are likely to succeed on the merits of their claim that the Act is unconstitutional for two reasons: (1) the Act deprives them of due process because it is unconstitutionally vague; and (2) the Act unconstitutionally imposes an "undue burden" on a woman's right to have an abortion because it fails to provide an adequate exception for when a banned procedure is best to preserve a woman's life and because it forecloses the safest method of abortion.

#### a. Void for Vagueness

When considering a challenge to a criminal statute under the void for vagueness doctrine, it must be determined: (1) whether the penal statute defines the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) whether the criminal offense is described in a manner that does not encourage arbitrary and discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).[18]

The void-for-vagueness doctrine embodies the cardinal principle of due process that a criminal statute must provide adequate notice to a person of ordinary intelligence that his contemplated conduct is legal because "no man shall be held criminally

---

**18.** *See also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (holding that ordinance is void for vagueness because it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute and it encour-

ages arbitrary and erratic arrests and convictions); *United States v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir.1992) (applying the two-part void-for-vagueness test to a money laundering statute, the Court of Appeals concluded that the criminal statute is not unconstitutionally vague).

responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). For that reason, where "a statute imposes criminal penalties, the standard of certainty [that due process requires] is higher." *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. 1855. More importantly, the standard of certainty is particularly strict "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin,* 439 U.S. 379, 391, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), *overruled in part on other grounds, Webster v. Reproductive Health Servs.,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). Vagueness standards cannot be mechanically applied because "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

In the view of one leading constitutional scholar, "[V]agueness occurs when a legislature states its proscriptions in terms so indefinite that the line between innocent and condemned conduct becomes a matter of guesswork." Laurence H. Tribe, *Constitutional Law* § 12–31, at 1033 (2d ed.1988). Moreover, "[t]he Court will generally strike down an ordinance for vagueness only if the actual activity proscribed is vaguely defined." *Id.* at 1034 n. 9.

The rationale for these fundamental precepts is found in the now-familiar explanation of the Supreme Court that:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevent-

ed, laws must provide explicit standards for those who apply them.

*Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (footnotes omitted). And, "the requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values ... and permits meaningful judicial review." *Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

These established principles must guide the assessment of the plaintiffs' vagueness challenge to the Act. However, it is equally important that the analysis be conducted mindful of the principles of federalism which are at the core of our constitutional government. Fealty to that important principle requires that the plaintiffs here must demonstrate the existence of real, rather than fabricated, vagueness in the statute which they seek preliminarily to enjoin. That is especially important where a federal court is called upon to forestall, even for a brief period, what the people of a State have wrought by their duly elected officials. *See Planned Parenthood of the Blue Ridge v. Camblos,* 116 F.3d 707, 721 (4th Cir.), *stay denied,* 125 F.3d 884 (4th Cir.1997).

Here the plaintiffs predicate their vagueness challenge on the defined term "partial birth abortion" and on several of its constituent terms "living fetus," "or a substantial portion thereof," and "deliver." Each will be assessed in turn.

#### (i) Partial Birth Abortion

The plaintiffs assert that the defined term "partial birth abortion" as a whole is so vague and general as to include most D & E abortions as they are performed generally and by the plaintiffs. Although the defendants argue that the definition of "partial birth abortion" is perfectly clear, their reasoning is not imbued with clarity or consistency.

The premise of the defendants' argument initially was that "partial birth abortion" simply referred to the D & X procedure. The affidavits filed by the Commonwealth Attor-

neys and by their medical experts conclude that: (1) the Act prohibits the procedure known as D & X; (2) they "do not consider" the Act to prohibit suction curettage abortions, drug-induced abortions, or "conventional D & E abortions"; and (3) in their view, a "conventional D & E abortion," such as the procedure the plaintiffs perform, is not transformed into a partial birth abortion within the meaning of the Act by an incidental protrusion of some part of the fetus from the cervical os before fetal death has occurred. (Defs.' Mem. Ex. 7, ¶ 5.)

The interpretation of the prosecuting attorneys is a factor to be considered in assessing the vagueness of a statute. *See Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). In their affidavits, the Commonwealth Attorneys, as did the Attorney General in his April 30 letter, take the position that the Act does not apply to any abortion procedure other than the one the General Assembly "intended" to proscribe: the D & X procedure.

Nonetheless, the defendants themselves, even in making this seemingly straightforward assertion, demonstrate confusion over the procedure, or procedures, which they think is or are "clearly" banned. For example, throughout the defendants' opposition papers, they argue alternatively that the Act will ban "certain procedures," but at other times they say it bans only the "partial birth abortion procedure." At times, the defendants claim that the term "partial birth abortion" only applies to the "D & X procedure," yet on other occasions, the Attorney General, and the defendants' expert witness at the hearing, Dr. Aultman, emphatically asserted that the "D & X procedure" is only one example of a procedure which is prohibited by the Act.

Although not dispositive of the vagueness question, it is significant that the term "partial birth abortion" lacks any medical meaning, and that no such term has even been used in any medical text or medical journal.[19] It is also significant that, in their affidavits and pleadings, the defendants do not define the D & X procedure with terminology drawn from the Act's definition of the term "partial birth abortion."

For example, in the Attorney General's April 30 letter to Senator Newman, he states that the D & X procedure is one which "involves delivering all but the head of the intact living fetus into the vagina, followed by 'partial evacuation of the intracranial contents with suction' so as to cause death and compress the skull before completion of the delivery." (Defs.' Mem. Ex. 1, at 2 n. 5 (quoting *Evans,* 977 F.Supp. at 1293).) The Commonwealth Attorneys adopt a similar definition of the allegedly "banned" procedure, stating that an intact D & E "means an abortion procedure or technique 'in which the physician, rather than removing the fetus in parts, removes it from a breech position intact up to the head, and then, if necessary, reduces the size of the head (by collapsing the calvarium using forceps or by evacuating it contents using suction) to remove the intact fetus the rest of the way.)'" (*Id.* Exs. 2–7, ¶ 4(e) (quoting *Evans,* 977 F.Supp. at 1293). The language used by the Attorney General and the Commonwealth Attorneys does not appear in the Act.

Interestingly, although the defendants repeatedly cite to the fact that a similar proscription on partial birth abortions in the 1997 federal bill was approved by the American Medical Association ("AMA"),[20] even the

19. (*See* Defs.' Mem. Ex. 20; Fitzhugh Decl. ¶ 19; Jones Decl. ¶ 22; deProsse Decl. ¶ 67; Hausknecht Decl. ¶ 29); *see also Woods,* 982 F.Supp. at 1379–80 (concluding that "partial birth abortion" was not medically accepted term); *Evans,* 977 F.Supp. at 1305 (finding that the term "partial-birth abortion" is not one found in the medical literature).

20. The AMA-approved federal bill proscribed a partial birth abortion not necessary to save the life of a mother whose life is endangered by a physical disorder, illness, or injury. The term "partial birth abortion" was defined there as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." The phrase "partially vaginally delivers a living fetus before killing the fetus" was defined as "deliberately and intentionally delivers into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus." Partial Birth Abortion Ban Act of 1997, H.R.1122, 105th Cong., 1st Sess. (1997).

terms used in the AMA's definition of a partial birth abortion are not reflected in the Act. The AMA report defines the D & X procedure to be comprised of the following elements: "deliberate dilatation of the cervix, usually over a sequence of days; instrumental conversion of the fetus to a footling breech; breech extraction of the body excepting the head; and partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus." (Defs.' Mem. Ex. 20.) This definition is essentially the same as the description approved by the ACOG to describe the D & X procedure. (*See* Amended Compl. Ex. B.)

Neither does the Act contain the material terms used in the descriptions of the procedure which appear in the affidavits filed by the defendants. For instance, the declarants define a D & X as an abortion procedure in which:

> the physician, rather than removing the fetus in parts, removes it from [in] a breech position intact up to the head (in some cases the physician may not manipulate the fetus into a breech as the fetus may present buttocks first), and then, if necessary, reduces the size of the head (by collapsing the calvarium using forceps or by evacuating its contents using suction) to remove the intact fetus the rest of the way.

(Defs.' Mem. Exs. 12–15, ¶ 5(e).) The declarations, of course, describe the D & X procedure essentially in the same terms used by the AMA and ACOG. The Act, however, does not confine its proscriptive term, "partial birth abortion," to those parameters.

According to counsel for the defendants, it is not by accident that the Act does not include the definition which is in the defendants, affidavits, or in the AMA or the ACOG definitions, or even the Attorney General's or Commonwealth Attorneys' definition. Thus, when queried why "partial birth abortion" in the Act was not defined with reference to those definitions of the D & X procedure, counsel for the defendants responded that, if the definition in the Act had been that precise, the providers of abortion would have made fine adjustments to their conduct so as to avoid falling within the statutory proscription. (Hearing Tr. at 203.)

Mindful of these various constructions, definitions, and interpretations of the term "partial birth abortion," it is now appropriate to assess the positions of the parties on the constituent definitional elements of the term.

### (ii) Delivers

The term "delivery" or "delivered" is given a broad meaning in obstetrics. (*See* deProsse Decl. ¶ 69.) In that medical specialty, anything that is removed from the uterus, which includes a baby, an intact fetus, a fetal part, or the placenta or umbilical cord, is "delivered." [21] As Dr. Hausknecht explained, in any non-surgical abortion procedure, the fetus, intact or in parts, is drawn out of the uterus and passes through, or is "delivered," into the vagina. (*See* Hausknecht Decl. ¶¶ 31–32.) Because vaginal delivery is a necessary part of every safe and common method of abortion, a physician performing an abortion always deliberately and intentionally "delivers" a fetus, or a portion thereof, into the vagina. (*See* Hausknecht Decl. ¶ 31; *See* deProsse Decl. ¶ 69.)

At the hearing, the defendants attempted to draw a distinction between "delivery" of a fetus into and through a cannula, as occurs during a suction curettage abortion, and delivery into the vagina itself. Dr. Fitzhugh, however, did not draw such a distinction because when the fetus is drawn by suction through the cannula from the uterus to the outside of the body, the fetus must pass through the vagina, albeit within the cannula. Dr. Jones concurred in this assessment, stating that, in performing a suction curettage, every part of fetal tissue must be removed, and that since the tube used to remove the fetal tissue is placed inside the vagina to the uterus, the fetal tissue "definitely" passes through the vagina en route to the outside of the body.

---

21. (*See* deProsse Decl. ¶ 69; *see also Hope Clinic*, 995 F.Supp. 847, 854 (finding that "[a]nything that is removed from the uterus, whether it is a fetus, a fetal part, or a baby, is 'delivered' "); *Evans*, 977 F.Supp. at 1306 (concluding that "anything that is removed from the uterus is 'delivered' ", whether it is a baby, a placenta, or a fetal part).

### (iii) "Living Fetus"

It is not disputed that, in medical terms, a "living fetus" is one which evinces a heartbeat, at a specified rate, for a certain period of time and that that circumstance occurs at about 10 weeks lmp. The term "living fetus," however, is clearly not commensurate with the medical term "viability" which occurs at 23 to 25 weeks lmp.

The plaintiffs and their experts testified that the statutory term "living fetus" is unclear because it is neither defined nor confined to the accepted medical definition. (*See* Fitzhugh Decl. ¶ 21; Jones Decl. ¶ 23; deProsse Decl. ¶ 70; Hausknecht Decl. ¶ 32.) The physicians' concern over the indefiniteness of the term "living fetus" is based on the fact that, when a physician performs a suction curettage or a D & E procedure, he cannot know at what point during the procedure the fetus would no longer qualify as "living" under the Act because without a continuous ultrasound,[22] there is no way to ascertain when the fetal heartbeat disappears. (*See* Hausknecht Decl. ¶ 32; Fitzhugh Decl. ¶ 21; Jones Decl. ¶ 23.) Dr. Fitzhugh avers that, while performing a suction curettage or D & E procedure, he does not know the exact point at which the fetus dies, and that depending on the definition of the term, the fetus might still be "living" while a substantial portion of a disarticulated fetus is brought into the vagina. Further, because the term fetus includes the umbilical cord, the Act might apply when the cord is drawn into the vagina, as happens frequently. Also, when Dr. Fitzhugh performs a suction curettage procedure, some portions of the fetus are removed into the vaginal canal while other portions remain in the uterus, and the portions remaining in the uterus might still be "living" for purposes of the Act. (*See* Fitzhugh Decl. ¶¶ 22–23.) This is consistent with Dr. deProsse's affidavit, which states that in a suction curettage procedure, after a part of the fetus is evacuated into the vagina, other parts of the fetus often remain in the uterus, which might still be "living," as that term is medically defined.

Dr. Hausknecht testified that there was no medical technique to determine when a fetus "died" during an abortion procedure. However, he also explained that, at the moment a fetus traverses the vagina on its way out of the body, the fetal cells are still "living" because they have not yet been deprived of oxygen or blood supply and, thus, the fetus might not be said to have "died" until after it has left the body entirely.

Other courts attempting to ascertain the definition of the undefined term "living fetus" in similar statutes have encountered analogous difficulties. For example, in *Planned Parenthood of Southern Arizona, Inc. v. Woods,* 982 F.Supp. 1369 (D.Ariz.1997) the district court observed:

> Does "living fetus" under the Act refer to the presence of a fetal heartbeat? Alternatively, does "living fetus" refer to living cells? As demonstrated by the testimony in this case, reasonable physicians differ as to the meaning of what is "living". In addition, the Act does not define when fetal death occurs.

*Woods,* 982 F.Supp. at 1379; *see also Hope Clinic,* 995 F.Supp. 847, 854 ("Without a clear definition in the statute as to the meaning of the term 'living,' a physician cannot know whether her conduct falls within the statute's reach."). In each instance, the court sustained a vagueness challenge to the ban.

The defendants take the position that "living is not a difficult word to understand" and that living "is simply the opposite of death." That definition conforms to the dictionary definition of the word "living" as "having life: not dead." *See* Webster's Third New International Dictionary (1986). However, the dictionary definition is quite different than the medical term. In any event, the definition to which the defendants now subscribe does not appear in the Act. Moreover, the evidence in this record tends to show that people of common intelligence could differ as to the meaning and interpretation of the term "living fetus." That conclusion is supported by the decisions of other courts which

---

**22.** Dr. Hausknecht testified that, during the second trimester, it is not common practice to monitor the patient while conducting an abortion through a continuous ultrasound, although that practice is followed in the clinic of which he is the Medical Director.

have struggled to find the meaning of the term.

#### (iv) "Substantial Portion Thereof"

The term engendering the most controversy in this action is "substantial portion thereof" [of a "living fetus"]. The plaintiffs say that they do not know from the Act how much of the living fetus could be considered "a substantial portion thereof," and, therefore, they apprehend that the performance of the suction curettage and D & E procedure could fall within the ambit of the Act. Dr. Fitzhugh avers that he is unclear as to how much of the fetus is considered to be a substantial portion, as that term is used in the Act, and he considers that a hand or a leg could be considered a "substantial portion." (See Fitzhugh Decl. ¶ 23; Jones Decl. ¶ 24.) Dr. Hausknecht's testimony also established the term "substantial part thereof" to be unclear, and that the term could mean a leg because even though, in volume a leg was less than that of the torso, by length, the leg could be 1/3 to 1/2 the length of the torso.

The defendants offered the testimony of an expert, Dr. Aultman, to quell the plaintiffs' apprehension and to show that "substantial portion thereof" was a clearly defined term to medical professionals. Dr. Aultman opined that a "substantial portion" must be at least 1/3 of the fetus. She also stated that she had not personally encountered any physician who would consider an arm or a leg to constitute a substantial portion of the fetus. Dr. Aultman conceded, however, that she was only expressing a personal opinion and also testified that "substantial" could just as easily be construed as 25% of the fetus, or 35%, or the 1/3 figure which she supplied on direct examination. Dr. Boehm, one of the defendants' experts, stated that, in his opinion, the term "substantial part thereof" would not include a hand, but that "I'm not sure that I can define that, but I don't think anyone has or would." (Pls.' Reply Br.Ex. A).

The defendants correctly argue that the term "substantial" has been found to be a "term not so vague as to be invalid." *Republic Indus., Inc. v. Teamsters Joint Council*, 718 F.2d 628, 643 (4th Cir.1983) (citing *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 48–49, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966)), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Neither *Republic Industries* nor the Supreme Court decision to which it cites, is persuasive here because the statutes in those cases were concerned with economic regulations. In this case, we are concerned with a criminal statute which, because the consequence of imprecision is more severe, must meet a more exacting standard of clarity than is required of civil or administrative statutes. *See Village of Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186.

Given the requisite scrutiny and considering the record evidence, there is certainly grave doubt that the term "substantial portion thereof" supplies the kind of notice requirement to avoid a finding of vagueness or whether the term is sufficient to prevent arbitrary prosecution.

#### (v) Application to Procedures Performed by Plaintiffs

Although the imprecision of these terms may not seem serious to the person uneducated in the specifics of abortion procedures, when these terms are considered in light of the exact descriptions of the procedures which the plaintiffs perform, the imprecision assumes quite troublesome proportions. Indeed, even Dr. Aultman, the defendants' expert, essentially admitted that the definition of "partial birth abortion" in the Act was so imprecise that it might not cover the D & X procedure which she believed the definition was intended to encompass. At the same time, Dr. Aultman's testimony disclosed that the Act could encompass other forms of abortion, such as suction curettage and D & E as performed by the plaintiffs.

Based on this record, that conclusion is not a far-fetched result. For example, in a suction curettage procedure, as performed by the plaintiffs, the physician "delivers" portions of the fetus from the uterus into and through the vagina through a cannula. The physician does not know when the fetus "dies" and it is entirely possible that the fetus may still be "living" when portions of the fetus are in the vagina, with other portions remaining in the uterus. Further, according to the testimony of Dr. Jones, it is possible at the early stages of gestation for a suction procedure to result in the entire fetus

being brought into the cannula, and hence into and through the vagina, intact. As Dr. Jones made clear, the physician would not know how long the heartbeat of the fetus would continue after removal.

On this record, it appears that, during a suction curettage procedure, the physician could "deliver" a "living fetus" or a "substantial portion thereof" into the vagina, for the purpose of performing a procedure with the intent of killing the fetus, which kills the fetus, and then complete the delivery. So construed, the physician would appear to violate the Act when performing the suction curettage procedure.

Dr. Aultman's attempt to explain why the Act would not apply to a suction curettage procedure was unconvincing at best. Dr. Aultman testified that the Act could not include the suction curettage procedure because the movement of a fetus from the uterus through the cannula did not constitute a "birthing process." That is hardly pertinent because the Act does not proscribe conduct in terms of the "birthing process." Thus, rather than refuting the plaintiffs' apprehension as ill-taken, Dr. Aultman's testimony seems to underscore the Act's indefiniteness.

The problem is even more in evidence when the term "partial birth abortion" and its constituent parts are considered in context of the description of the D & E procedures, as performed by the plaintiffs.

Testimony at the preliminary injunction hearing established that, in performing a D & E, the physician must rely on "feel" in reaching through the uterus to "grab" a portion of the fetus. Often, the physician will bring into the vagina a fetal leg or arm which remains attached to the thorax of the fetus still in the uterus. As Dr. deProsse states in his affidavit, a physician "can neither predict nor control whether, in the course of the D & E, such an event will occur while the fetus is still alive." (deProsse Decl. ¶ 71). If "substantial portion thereof" is defined to encompass a fetal arm or leg, this procedure would come within the ambit of the Act because a "substantial portion" of the fetus would have been "delivered" into the vagina, and the fetus may still be "living" while the physician uses forceps to complete the procedure which

kills the fetus (often crushing the fetal skull to effect delivery) and finishes the delivery.

The plaintiffs' evidence also established that, in some cases, during a D & E procedure, the physician may remove the entire fetus from the uterus into the vagina in an intact condition. (See Fitzhugh Decl. ¶ 12.) As Dr. Hausknecht testified, it is considered medically more advantageous to the woman's health to remove an intact fetus, rather then dismembering the fetus in utero, because this reduces the risk of uterine perforation or infection from having instruments inside the uterus. (See also deProsse Decl. ¶¶ 28, 72 (stating that in a D & E procedure, the physician usually removes a fetus in parts, but that sometimes it may be removed largely intact, which is more beneficial for the woman's health since it "reduces the number of times a physician must insert sharp instruments into the uterus").)

The defendants respond to this evidence by arguing that the so-called "conventional D & E" cannot fall within the meaning of the Act because, in most D & E procedures, dismemberment of the fetus occurs within the uterus and, therefore, the fetus is not living when it passes through the vagina. This distinction was also drawn by the defendants' expert witness, Dr. Aultman. However, she conceded that, if the term "substantial" were defined to include a fetal arm or leg, and a fetal arm or leg had been delivered into the vagina while the remainder was in the uterus, the so-called "conventional D & E" would clearly be proscribed by the Act. (See also Pls.' Reply Br.Ex. A) (excerpting testimony of Dr. Boehm, one of defendants' declarants, in which he agrees that if a fetal hand were deemed a legal definition of "substantial portion" of a fetus, the Act would include D & E procedures).

Dr. Aultman, like the defendants and the Attorney General, takes the position that, even with that definition of "substantial portion," the D & E procedure was distinguishable from the D & X procedure. Specifically, Dr. Aultman testified that in the D & X procedure, the "act of killing" occurs in the external os of the cervix, whereas the death of the fetus in a D & E procedure occurs in the internal os. However, as Dr. Aultman

conceded, the Act does not confine its proscriptions to procedures designed to terminate the fetus which are performed in the vagina.

At oral argument, defendants' counsel attempted to present Dr. Aultman's testimony in a slightly different manner to distinguish the D & E procedure from the D & X procedure by stating that, in the D & E procedure, the "killing" of the fetus is a one-step process, whereas in the D & X procedure, the fetus is (1) brought into the vagina and then, (2) the fetus is killed. This sequencing theory does not assist the defendants on the vagueness issue because the Act does not confine its proscriptions to a procedure which "kills" the fetus in the vagina, nor does it distinguish on its face between a procedure where the fetus is killed in "one step" as opposed to "two steps."[23] And, in any event, the defendants' counsel has acknowledged that the Act covers more than the D & X as defined by the ACOG and the AMA. On this record, the most likely candidate for inclusion is the D & E, of which a D & X is undisputably but one variant method.

### (vi) Conclusion

■ The operable terms of the Act, the specific descriptions of the precise nature of the D & E and suction curettage procedures performed by the plaintiffs, and the positions of the defendants and their witnesses persuasively illustrate that the Act does not give "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."

While the defendants argue that common sense dictates that the General Assembly intended only to proscribe the D & X and similar procedures, when persons of ordinary intelligence, including the defendants' own expert, are confused as to the statute's meaning and differ as to the interpretation of the Act, there is good reason to believe that, at law, the statute is unclear and ill-defined.[24] This is especially true where the D & X procedure is but one way to perform a D & E procedure. The legislature's intent may well have been only to ban the controversial D & X procedure, but the statute is written so that it goes beyond that procedure and would seemingly prohibit many otherwise acceptable D & E and suction curettage abortion procedures. This is confirmed by the fact that counsel for the defendants will not agree that those procedures, as performed by the plaintiffs, are within the interpretative immunity reflected in the defendants' affidavits.

The defendants point out that nine states, including Virginia,[25] have enacted legislation based on the vetoed 1997 federal statute, and that only four of those statutes have been enjoined,[26] none on grounds of vagueness. The defendants also emphasize that judicial challenges have not even been mounted in ·five states. They stress that, in *Planned*

---

**23.** The efforts of counsel to save the statutory definition by reliance on the sequencing theory is particularly unpersuasive when one remembers (1) that the ACOG definition of the D & X requires four steps performed in sequence, and (2) that the defendants have expressly eschewed use of that definition to delineate the "partial birth abortion" proscribed by the Act.

**24.** The Court notes that, in defending the plain meaning of the Act, the defendants make much ado about the AMA's approval of the 1997 federal bill, after which the Virginia statute is modeled, and the AMA's conclusion with respect to that bill that this version would clearly put physicians on notice of what procedures are banned by the Act. The federal version, however, was contested by another leading medical group, the ACOG, on the grounds that it was vague, that it did not delineate a specified procedure in the medical literature, and that the definitions could be interpreted to include elements of many recognized abortion and operative obstetric techniques.

Thus, while the defendants may have one medical group willing to vouch that this statute is clear and unmistakably applies to only one type of procedure, it is clear from the adverse position of the ACOG that persons of common intelligence could reasonably differ as to the interpretation of this statute. In short, the AMA's approval of the definition after which the Act is modeled does not establish that reasonable people can no longer disagree about the Act's applicability to certain abortion procedures.

**25.** Idaho, Iowa, Kentucky, Nebraska, New Jersey, Oklahoma, Tennessee, Virginia, and West Virginia.

**26.** Idaho, *Weyrich v. Lance*, No. 98–0117–5–BLW (Idaho Mar. 27, 1998); New Jersey, *Planned Parenthood of Central N.J. v. Verniero*, .No. 97–6170 (D.N.J.Decl.16, 1997); Nebraska, *Carhart v. Stenberg*, 972 F.Supp. 507 (D.Neb.1997); and West Virginia, *Brancazio v. Underwood*, No. 2:98–0495 (S.D.W.Va. June 11, 1998).

*Parenthood of Wisconsin v. Doyle*, 9 F.Supp.2d 1033 (W.D.Wis.1998), a federal court held that the Wisconsin statute, which is a variant of the 1996 vetoed federal statute, was not void for vagueness. From these observations, the defendants contend that the plaintiffs are straining the language of the Act to fabricate vagueness where none exists.

To begin, it seems obvious that decisions which do not mention vagueness are not helpful in deciding a vagueness challenge. Nor is it useful to speculate why persons in the five other states have not challenged the statutes there.

The decision in *Doyle* is on a record different than that which has been presented here. Indeed, it appears that, in *Doyle*, Dr. Aultman, who testified for Wisconsin, did not have the same difficulty understanding the Wisconsin statute as she manifested in her testimony here. Moreover, in *Doyle*, the court held that the Wisconsin statute proscribed only a procedure defined by ACOG and the AMA as a D & X (Intact D & E) procedure. *See Doyle, supra*, at 1036. The Virginia Act does not so provide.

Here, counsel for the defendants and the State's expert do not agree that, whatever the Act may mean, it is confined to the procedure defined as a D & X by ACOG and the AMA. Moreover, the State does not agree that the suction curettage and the D & E procedures, as performed by the plaintiffs, are immune from the definition of partial birth abortions. Hence, *Doyle* is not persuasive on the vagueness issue presented in this action.

■ On this record, and considering the decisions of courts which have confronted the vagueness issue respecting similar statutory terms, there is no doubt that, on their vagueness challenge, the plaintiffs have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them grounds for more deliberate investigation." They thus have satisfied the requirements of *Blackwelder, Direx Israel,* and

*Rum Creek* on that facet of the test. Indeed, on that issue, the plaintiffs have satisfied the more stringent "substantial likelihood of success" formulation as applied in many other circuits.

### b. Undue Burden: The *Casey* Test

#### 1. Standard of Review Applicable to Facial Challenges to Abortion Regulations

The parties are also at odds over the appropriate standard of review to be applied in assessing a facial challenge to laws alleged to have an undue burden on the right to abortion. "[S]ince *Roe*, no one standard of review" to be utilized in cases calling into question the facial validity of abortion laws "has secured a solid majority of the Court." *Manning v. Hunt*, 119 F.3d 254, 268 n. 4 (4th Cir.1997). The defendants urge the application of the test enunciated in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), arguing that a State statute, including a law limiting abortion, is invalid on its face only if "no set of circumstances exists under which the Act would be valid." The plaintiffs, however, contend that an abortion law cannot survive a facial challenge if the evidence demonstrates that "in a large fraction of the cases in which [the abortion law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791.

■ The Fourth Circuit has not yet decided "whether, in *Casey*, the Supreme Court *sub silentio* overruled its decision in *Salerno* on the standard of review applicable to facial challenges to statutes regulating abortion." *Camblos*, 116 F.3d at 712; *see, e.g., Manning*, 119 F.3d at 268 n. 4 ("The parties have not asked this Court to decide that the District Court improperly applied the *Salerno* standard for review of [the plaintiff's] facial challenge[ ]" to the State statute requiring parental or judicial consent for an unemancipated minor's abortion.).[27] Recognizing the

**27.** The defendants argue that the Court is bound by a footnote in the Fourth Circuit's recent decision in *Manning v. Hunt*, 119 F.3d 254 (4th Cir.1997). The footnote observed that, because *Casey* does not expressly overrule *Salerno*, the latter should enjoy continued application in the context of facial challenges to abortion regulations. *Id.* at 268 n. 4. That, of course, is dicta because the parties did not request the Fourth Circuit to decide the issue and the plaintiff conceded that *Salerno* applied. *Id.* Dicta is a helpful tool to decision making, but the footnote in *Manning* does not hold sway here because the issue was conceded and thus it "was not refined by the

conflict between the *Salerno* and *Casey* standards, and finding the reasoning of the Sixth, Eighth, and Tenth Circuits persuasive,[28] the Court concludes that *Salerno* no longer applies in the context of a facial challenge to a law on the ground that it imposes an undue burden on the right to an abortion.

In *Salerno*, the Supreme Court observed that "[a] facial challenge to a legislative Act is, of course, the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. Although "[t]he Supreme Court has previously applied *Salerno* in striking down facial challenges to abortion laws," a plurality of the Court in *Casey* announced a new standard in assessing facial challenges to abortion statutes. *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1457 (8th Cir.1995) (citing *Rust v. Sullivan,* 500 U.S. 173, 182–84, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)); *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 524, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). As Chief Justice Rehnquist stated in dissent, because *Casey* involved a facial challenge to the State statute's spousal-notification requirement, Planned Parenthood "must 'show that no set of circumstances exists under which the [provision] would be valid,'" a burden that the plaintiffs failed to meet. *Casey,* 505 U.S. at 973, 112 S.Ct. 2791 (Rehnquist, C.J., dissenting). Indeed, the Commonwealth of Pennsylvania asserted in Casey that the spousal-notification requirement "impose[d] almost no burden at all for the vast majority of women seeking abortions," contending that "the effects of [the requirement] are felt by only one percent of the women who obtain abortions." *Id.* at 894, 112 S.Ct. 2791. The *Casey* joint opinion, however, explained that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* Accordingly, the joint opinion went on to hold that, if the abortion law, "judged by reference to those for whom it is an actual ... restriction," "operate[s] as a substantial obstacle to a woman's choice to undergo an abortion[,]" the law "is an undue burden, and therefore invalid." *Id.*

As the Sixth Circuit recently explained, the touchstone of *Salerno* is at fundamental odds with the standard set forth in *Casey*:

> Under *Salerno*, no factual showing of unconstitutional applications can render a law unconstitutional if it has any constitutional

---

fires of adversary presentation." *United States v. Crawley,* 837 F.2d 291, 293 (7th Cir.1988) (stating that dicta "is the part of an opinion that a later court, *even if it is an inferior court,* is free to reject") (emphasis added).

28. *See Women's Medical,* 130 F.3d at 195–96 ("We hold that this circuit should 'follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue burden test' without regard to *Salerno.*") (citation omitted), *cert. denied,* — U.S. —, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *Jane L. v. Bangerter,* 102 F.3d 1112, 1116 (10th Cir.1996) (holding that the correct standard "after *Casey* is the 'undue burden' standard applied by the Court in that case"), *cert. denied sub nom. Leavitt v. Jane L.,* — U.S. —, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1456–58 (8th Cir. 1995) (holding that the *Casey* "Court effectively overruled *Salerno* for facial challenges to abortion statutes"), *cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic,* 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); *see, e.g., Casey v. Planned Parenthood of Southeastern Pa.,* 14 F.3d 848, 863 n. 21 (3d Cir.) (noting, in dicta, that "the Court has, in this case, set a new standard for facial challenges to previability abortion laws.... *Casey* requires only that a plaintiff show an abortion regulation would be an undue burden 'in a large fraction of the cases'") (quoting *Casey,* 505 U.S. at 895, 112 S.Ct. 2791), *stay denied,* 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994); *see also Hope Clinic v. Ryan,* 995 F.Supp. 847, 859–860 (N.D.Ill.1998) (holding that the plurality decision in *Casey* displaced *Salerno* in abortion cases) (to be reported at 995 F.Supp. 847); *Wicklund v. Lambert,* 979 F.Supp. 1285 (D.Mont.1997) (applying the *Casey* standard of review in an action contesting the facial validity of an abortion statute containing a parental consent provision). *But see Manning,* 119 F.3d at 268 n. 4 (noting, in passing dicta, that "[u]ntil the Supreme Court [expressly overrules *Salerno* ] this Court is bound to apply the *Salerno* standard as it has been repeatedly applied in the context of other abortion regulations reviewed by the Supreme Court"); *Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir.) ("[W]e do not interpret *Casey* as having overruled, *sub silentio,* longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes."), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992).

applications. Under *Casey*, a factual showing of unconstitutional applications, in a substantial percentage of the cases where a law applies, can render a law unconstitutional *even if* the law has constitutional applications.

*Women's Medical*, 130 F.3d at 194 (emphasis in original). Hence, as several courts of appeals have recognized, the effect of *Casey* is that the *Salerno* standard of review does not apply in cases challenging, on undue burden grounds, the facial validity of abortion statutes. *See Women's Medical*, 130 F.3d at 195; *Bangerter*, 102 F.3d at 1116; *Miller*, 63 F.3d at 1456–58; *see also Planned Parenthood of Southeastern Pa.*, 14 F.3d at 863 n. 21.[29]

▆ In light of the cogent decisions issued by the Sixth, Eighth, and Tenth Circuits, the Court considers that, absent controlling Fourth Circuit precedent, it is necessary to follow the rule applied by the Supreme Court in the plurality decision in *Casey*. The inquiry in this action, then, is whether "in a large fraction of the cases in which [the Act] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791.

### 2. The Undue Burden Analysis

In *Roe v. Wade*, 410 U.S. 113, 152–66, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court upheld *Roe*'s "essential holding" by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." In *Casey*, the Supreme Court also confirmed "the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health." *Id.* The Court made clear that

"the State has legitimate interests from the outset of pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Id.*

The question in *Casey* was "whether a law designed to further the State's interest in fetal life, but which imposes an undue burden on the woman's decision before fetal viability, could be constitutional. The answer is no." *Id.* at 877, 112 S.Ct. 2791 (citations omitted). The plurality opinion contains a summary which is essential to assessment of the issues here presented. Its salient components for this case are that:

- An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus obtains viability.

- To promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. These measures must not be an undue burden on the right.

- As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.

- Regardless of whether exceptions are made for particular circumstances, a *State may not prohibit* any woman from making the ultimate decision to terminate her pregnancy *before viability*.

- We also reaffirm *Roe*'s holding that "*subsequent to viability*, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical*

29. As the Sixth Circuit recognized in *Women's Medical*, 130 F.3d at 196, there is "no reason to apply a different standard for pre- and postviability abortion." Accordingly, the *Casey* standard is applicable to actions contesting the facial validity of abortion statutes restricting both pre- and post-viability abortions. *Id.; see Bangerter*, 102 F.3d at 1115–16.

*judgment, for the preservation of the life or health of the mother."*

*Id.* at 878–79, 112 S.Ct. 2791 (emphasis added) (citation omitted). The plurality explained that "[a] finding of undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791.[30]

### (i) The Absence of an Exception For the Mother's Health

The plaintiffs argue that the Act imposes an unconstitutional undue burden on a woman's right to choose an abortion because it fails to provide an exception for the preservation of the health of the mother, in direct contravention of the dictates of *Roe* and *Casey.* The Act clearly contains no such exception.

The defendants seek to excuse this ostensibly fatal defect by asserting the rather unusual view that *Roe* and *Casey* are inapplicable because, in those decisions, the Supreme Court did not announce constitutional protections to abortions where "the child is partially born." The Court declines the State's invitation to circumvent the requirements of *Roe* and *Casey.*

Simply put, *Roe* and *Casey* established the line of demarcation for a State's ability to regulate and proscribe abortion in terms of whether the fetus was viable or nonviable, not in terms of whether a fetus was in the process of being born. *Casey,* 505 U.S. at 879, 112 S.Ct. 2791. ("We conclude that the line should be drawn at viability, so that

before that time a woman has a right to choose to terminate her pregnancy."). The defendants' argument, therefore, reduces itself to the premise that a district court can make an unprecedented distinction between a woman's right to terminate a non-viable fetus in utero and a non-viable fetus in the birthing canal. The only authority cited in support of this proposition are the recent decisions in physician-assisted suicide cases which the defendants have interpreted to signal the demise of *Roe* and *Casey.*[31] Even if the defendants correctly interpret these decisions, it is not for this Court to upset the balance struck in *Roe* and *Casey* between two very important sets of competing rights and interests.

Other courts have rejected similar entreaties to delineate a judicial category for a fetus in the process of being born. For example, in *Carhart v. Stenberg,* 972 F.Supp. 507 (D.Neb.1997), the district court considered the defendants' argument that *Roe* and *Casey* were inapplicable to the Nebraska partial birth abortion statute because " 'the Supreme Court has never recognized a constitutional right to kill a partially born human being.' " *Id.* at 529 (quoting defendants' brief in opposition). The court in *Carhart* rejected the defendants' argument because "there is no precedent for it." *Id.* *Carhart* clearly is right; and, therefore, *Roe* and *Casey* supply the informing rule in assessing whether the plaintiffs are likely to succeed on the merits of their argument that the Act's failure to provide an exception for the health of the mother imposes an undue burden on a woman's right to choose to have an abortion.

---

**30.** The joint opinion from which this language is quoted was subscribed to only by a three-member plurality of the Court. However, Justice Stevens specifically accepted the proposition that " '[i]f a State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.' " *Casey,* 505 U.S. at 912, 112 S.Ct. 2791 (Stevens, J., concurring in part and dissenting in part) (quoting *Roe,* 410 U.S. at 163–64, 93 S.Ct. 705). In addition, Justice Blackmun concurred in reaffirming the "essential holding of *Roe* that 'forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health.' " *Id.* 505 U.S. at 925 n. 2, 112 S.Ct. 2791 (Blackmun, J., concurring in

part, concurring in the judgment in part, and dissenting in part) (quoting *Roe,* 410 U.S. at 164, 93 S.Ct. 705). Moreover, because both Justice Stevens and Justice Blackmun went further than the plurality in deciding the relative rights of the woman and the State, the most limited basis of decision becomes the law. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Hence, contrary to the urging of the defendants, *Casey* does supply the law by which this action must be decided.

**31.** *See, e.g., Washington v. Glucksberg,* —— U.S. ——, 117 S.Ct. 2302, —— L.Ed.2d —— (1997); *Vacco v. Quill,* —— U.S. ——, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997).

As an alternative, the defendants make the difficult to fathom argument that the "partial birth abortion" procedure proscribed by the Act was developed primarily for use when the fetus is "in the range of viability" and that the procedures which the Act prohibits are never "necessary" to protect a woman's health because alternative procedures are always available at that stage of pregnancy.[32] The defendants cite no authority for this fallback position.

As explained above, however, the record shows that the Act could apply to the performance of D & E procedures, as these plaintiffs described their method, and perhaps to some suction curettage procedures. Thus, it is necessary to consider the Act's failure to include an exception for the health of the mother as it impacts the physicians' performance of these procedures.

First, it is clear from the record that the procedures the plaintiffs perform, which could be encompassed within the Act's ban, are performed on nonviable fetuses. According to the AMA Report, D & E procedures, of which the D & X procedure is a subset, are performed in the second trimester from as early as 13 weeks lmp, until 24 weeks lmp. (*See* Defs.' Mem.Ex. 20, Ex. B, at 8–9.) The AMA report also indicates that the time period between 20 and 27 weeks lmp is considered to be a "gray zone" in which some fetuses are viable, while others are not. The AMA Report further states that "[s]ome of the medical procedures used to induce abortion prior to viability are the same or very similar to procedures used in post-viability abortions, and therefore there is no clear distinction between some later-term pregnancy techniques and those which are used earlier to end the pregnancy." (*Id.* Ex. 20, Ex. A.) Thus, the AMA Report undercuts the

argument that the procedures to which the Act applies are "primarily for use on fetuses in the range of viability." (Defs.' Mem. at 26.) In sum, the factual premise of defendants' position is called into question by their own evidence, and certainly is contradicted by the plaintiffs' evidence.

However, even if the Act pertained only to procedures performed on viable fetuses, *Roe* and *Casey* are clear that, although a State may proscribe abortion at viability, it must include exceptions for the life and health of the mother so as to avoid violating the Due Process Clause of the Fourteenth Amendment. *See Casey*, 505 U.S. at 879, 112 S.Ct. 2791; *Roe*, 410 U.S. at 164–65, 93 S.Ct. 705. It would seem to follow that, if a State may proscribe abortion at viability only if the law provides exceptions for the health and life of the mother, any similar regulations governing a fetus at pre-viability also must include exceptions for the life and health of the mother. Otherwise, the law would impose an "undue burden" on her right to seek an abortion at the pre-viability stage.

Although the Act provides an exception for a partial birth abortion that is necessary to save the life of the mother, it fails to provide an exception to save the health of the mother.[33] Thus, the plaintiffs have made a strong case that the Act lacks a component that is essential for it to pass constitutional muster under *Roe* and *Casey*.

That leaves the question whether the suction curettage and D & E procedures which the plaintiffs perform, which appear to fall within the reach of the Act, are "necessary" to save the health of the mother.

The AMA Report includes a statistical chart showing that, in the United States in 1992, 86% of the abortions performed at 16–20 weeks lmp were performed by the suction or sharp curettage or the D & E method,[34]

---

**32.** At the same time, the defendants argue that the term "living fetus" marks a point at, at least, 10 weeks lmp. Under that definition, the Act attaches well before viability.

**33.** The Virginia General Assembly knows how to include language providing an exception for the health of the mother, as is evidenced by Va.Code § 18.2–74, which provides that a physician may lawfully perform an abortion after the second trimester of pregnancy under certain circumstances, based upon the physicians' best clinical judgment that "the continuation of the pregnancy is likely to result in the death of the woman or

substantially and irremediably impair the mental or physical health of the woman." Of course, in the case of the partial birth abortion procedure, the provisions of Va.Code § 18.2–74 are eviscerated by the Act, which states: *"[n]otwithstanding the provisions of Sections 18.2–72, 18.2–73 and 18.2–74*, a physician shall not knowingly perform a partial birth abortion that is not necessary to save the life of a mother." (first emphasis added).

**34.** The statistical table states that the percentages for sharp or suction curettage procedures also includes figures for D & E.

whereas only 8.8% of the abortions performed in that time frame were performed by labor induction. (Defs.' Mem.Ex. 20, at 7.) Even at greater than 21 weeks lmp, the suction or sharp curretage or D & E methods were used in 86.4% of the abortions, while the labor induction method constituted 9.1% of these abortions. (*Id.*)

The AMA report also recognizes that hysterotomy and hysterectomy surgeries have been used to terminate pregnancy, but explains that they are not used routinely as a form of abortion because "maternal mortality and morbidity associated with these procedures are significantly greater than those associated with other procedures used to induce abortion." (*Id.* at 9.)

On the need for the D & E procedure, Dr. deProsse avers that D & E procedures "are almost always preferable" to labor induction procedures, the only other non-surgical second trimester abortion method, for several reasons. Specifically, Dr. deProsse asserts that: (1) the main risk of induction stems from the fact that it involves the same medical complications as labor and delivery at full-term; (2) a D & E takes only 10 to 30 minutes and entails "significantly less pain for the woman"; (3) the physiological stress of the labor itself makes induction relatively more dangerous and is often contraindicated for women with various medical conditions; and (4) certain complications are associated with specific methods of induction because high doses of labor-inducing medication can cause metabolic disturbances and can lead to potentially fatal heart, lung, and kidney problems, while prostaglandins, another labor-inducing medication, may cause vomiting, diarrhea, high fever, bronchospasms, and migraines. (*See* deProsse Decl. ¶¶ 53–57; *see also* Hausknecht Decl. ¶ 26.)

Dr. deProsse further notes that a D & E is "far preferable" to either hysterotomy or hysterectomy because these two procedures entail the risks of major surgery. (*See* deProsse Decl. ¶ 63.) And, the mortality rate associated with these two procedures is more than 10 times that associated with the D & E.[35]

The other affidavits submitted on behalf of the plaintiffs reach similar conclusions. For example, Dr. Fitzhugh avers that in his experience, labor inductions are more difficult to perform than D & E's, pose more of a risk to the woman, and have greater rates of morbidity because inductions, unlike D & E procedures, are more likely to result in ruptured cervixes, infections, and other complications. (*See* Fitzhugh Decl. ¶ 15.) Further, Dr. Jones indicates that where induction is contraindicated for a woman, D & E procedures are the only safe abortion procedures available that do not involve major surgery.[36] (*See* Jones Decl. ¶ 19.) Dr. Fitzhugh also states that he had ceased performing hysterotomies because of the greater risk, including morbidity, associated with that procedure, and that hysterectomies and hysterotomies are no longer considered medically justifiable for abortion except in rare circumstances. (*See* Fitzhugh Decl. ¶ 16; Jones Decl. ¶ 21; Hausknecht Decl. ¶ 9.)

In addition, there is further evidence that the D & E procedure, as performed by the plaintiffs, is medically safer when the fetus is removed intact. Dr. deProsse acknowledges that a procedure in which the fetus is removed from the uterus intact, which occasionally happens when the plaintiffs are performing the D & E procedure, "is among the safe options of abortion after the first trimester, with certain possible advantages, for some patients, over D & Es that involve

35. Dr. deProsse also points out that the Act's exception for the life of the mother is illusory because, although a banned procedure may be the "best" option available to a physician for a woman whose life is in danger, it likely would never be the "only" procedure that would save her life, and thus would not be "necessary" to save her life as required by the Act. For example, Dr. deProsse states that although a hysterotomy is, in his view, an unacceptable method of abortion, it would terminate the pregnancy and would "likely, but not certainly, save the woman's life." (deProsse Decl. ¶ 77.)

36. Dr. Hausknecht's affidavit indicates that induction is more dangerous, and therefore contraindicated, for women with various medical conditions, including cardiac ailments and acute pelvic infections. Dr. Hausknecht also asserts that inductions may be contraindicated where the fetus has certain abnormalities. Further, if the woman has had a previous hysterotomy or classical cesarean section, induction can lead to uterine rupture, hemorrhage, and even death. (*See* Hausknecht Decl. ¶ 8.)

fragmenting of the fetus." (deProsse Decl. ¶ 58.) Further, Dr. Boehm, an expert for the defendants, stated in his affidavit that, although there have never been any studies comparing the trauma caused to a woman's cervix, uterus, or other vital organs depending on the different procedure used, he agreed that by removing the fetus intact, as opposed to dismembering the fetus as normally occurs in a D & E, there is less risk of leaving fetal tissue behind or of sharp fetal fragments puncturing the uterus, and thus, that it "might be safer for the woman." (Pls.' Reply Br. Ex. B, at 45.)

The foregoing statistical and testimonial evidence makes a strong case in support of the plaintiffs' contention that the Act would pose an unconstitutional undue burden on a woman's right to seek a pre-viability abortion from these plaintiffs because the Act operates to ban D & Es, as performed by the plaintiffs. The D & E is undisputably the most common and the safest method of abortion in the second trimester of pregnancy. "[I]t follows that a statute which bans a common abortion procedure would constitute an undue burden" under *Casey* because an "abortion regulation which inhibits the vast majority of second trimester abortions would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a previability abortion." *Women's Medical,* 130 F.3d at 201 (in that case, as here, the statutory definition of the proscribed method embraced the D & E procedure).

The plaintiffs have already established that the method by which they perform the D & E procedure likely is encompassed within the Act's ban. Absent a grant of injunctive relief, the plaintiffs would have to choose between a cessation of performing the D & E, or potential prosecution under the Act.[37] If the plaintiffs chose to stop offering the D &

E procedure to their patients, it would impose an undue burden on the patients' right to seek an abortion because it would deprive them of the most common and safest method of abortion procedure in the second trimester. The Constitution clearly forbids such a result.

Other courts examining similar legislative acts have also determined that the statute's failure to include an exception for the health of the mother imposes an undue burden on the woman's right to choose an abortion. For example, in *Carhart,* the district court considered a constitutional challenge to that State's partial birth abortion statute which provided an exception where the procedure was necessary "to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." Neb.Rev.Stat.Ann. § 28–328 (Michie 1997). After reviewing a presentation of medical evidence not unlike that which is now in this record, the district court granted a preliminary injunction upon a finding that the plaintiffs were likely to succeed on the merits of their argument that the statute was unconstitutional under *Casey* because the ban "has the effect of subjecting [the plaintiff's] patients to an appreciably greater risk of injury or death than would be the case if these women could rely upon [the plaintiff] to perform his variant of the banned procedure on nonviable fetuses when medically advisable." *Carhart,* 972 F.Supp. at 523. Specifically, the court determined that the ban forced Nebraska women to take appreciable medical risks that were not necessary to preserve their lives or health, and that in subordinating maternal life and health to the life and health of a nonviable fetus, the law imposed an unconstitutionally unacceptable

---

**37.** Defendants essentially concede that the Act could be construed to encompass the D & E procedure as performed by the plaintiffs because the defendants are unwilling to agree that the D & E procedure as the plaintiffs described it in their testimony is beyond the reach of the Act. Remarkably, defendants' counsel suggests that the remedy for avoiding prosecution under the Act while continuing to perform D & E's as the plaintiffs described, would be for the physicians to be more "careful" in the performance of the D & E, so as not to remove the entire fetus intact.

Considering that in utero dismemberment has been shown to be less safe for the woman, it is telling that the defendants suggest cessation of the procedure to avoid the risk of prosecution under the Act. More importantly, as the plaintiffs testified, they cannot control how much of a fetus emerges from the uterus into the vagina. As they perform the procedure, they reach inside the uterus and "grab" portions of the fetus, and if they are "lucky," then the entire fetus will emerge intact.

"undue burden" on a woman's right to choose an abortion. *Id.*

In *Planned Parenthood of Southern Ariz., Inc. v. Woods,* 982 F.Supp. 1369 (D.Ariz. 1997), the court considered the constitutionality of a statute which only provided an exception for the life of the mother. That court likewise concluded that the Arizona statute was unconstitutional under *Casey* because it failed to "provide an exception from banned procedures where such a procedure is necessary for a woman's health." *Id.* at 1378.

The plaintiffs' position finds further support in *Hope Clinic v. Ryan,* 995 F.Supp. 847 (N.D.Ill.1998). The court there noted that, as in Virginia's statute, the Illinois ban on partial birth abortions did not contain an exception to the ban when the woman's health was endangered, when the woman suffers from conditions or illnesses, or when the woman's health is endangered by the pregnancy itself or is compromised by the alternative abortion procedure. *Id.* at 850[38] The court held that the ban placed an undue burden on a woman's choice to have an abortion under *Casey* because "the statute does not permit a physician to use the prohibited procedure when the alternative procedures endanger the patient's health or exacerbate the existing health conditions." *Id.* at 857. The court in *Hope Clinic* held that, without the health exception, the statute placed a substantial obstacle in the path of a woman seeking an abortion before the fetus obtains

viability, and thus, it was unconstitutional. *Id.* at 854.[39]

In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 75–79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court considered a provision of a Missouri abortion statute which prohibited the use of saline amniocentesis, an abortion procedure used in 70% of all abortions performed after the first trimester of pregnancy. The appellants in that case argued that the proscription would virtually ban all abortions after the first trimester because the only other available methods, hysterotomy and hysterectomy, were significantly more dangerous, and prostaglandin installation, another method, was not widely used. The Supreme Court held that the proscription was unconstitutional, stating:

> The State ... would prohibit the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of pregnancy until normal childbirth. Moreover, as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed.

*Id.* at 78–79, 96 S.Ct. 2831. The Supreme Court concluded that the ban was not a reasonable regulation for the protection of maternal health, and instead, that it constituted an unreasonable or arbitrary regulation designed to inhibit the vast majority of abor-

---

**38.** Notably, in concluding that the ban unconstitutionally burdened a woman's right to choose an abortion because of the lack of an exception where necessary to preserve the woman's health, the court found that the other available procedures, namely, hysterotomies, hysterectomies, and labor inductions, entailed "significant health risks, even as much of a risk as the pregnancy itself presents." *Id.* at 860. These findings are consistent with the evidence before this Court.

**39.** This finding is also supported by the decision in *Evans v. Kelley,* 977 F.Supp. 1283 (E.D.Mich. 1997). In granting a preliminary and permanent injunction on that state's partial birth abortion ban, the court stated:

> Therefore, because *Casey* requires that, prior to viability, a banned procedure, to survive constitutional scrutiny, may not pose an undue burden to women seeking abortion by placing a substantial obstacle in their path, this Court

must find that the Michigan "partial birth abortion" statute ... will operate as a substantial obstacle to a woman's choice to undergo an abortion. Indeed, because of the sweeping breadth of the statute, it would operate to eliminate one of the safest post-first trimester abortion procedures, a procedure which currently is used in more than 85% of the post-first trimester abortions performed in Michigan. If the D & E procedure were eliminated, many women, and particularly those at 13 to 16 weeks of pregnancy, would be left with no alternative other than hysterotomy or hysterectomy, far riskier procedures. Additionally, there are a number of women for whom inductions—an alternative generally available after 16 weeks—are contraindicated.... To leave women with only far riskier alternatives to the D & E clearly imposes an undue burden on a woman's right to seek a pre-viability abortion. *Id.* at 1318 (footnote omitted).

tions performed after the first trimester of pregnancy. *Id.*

A number of courts have found that the effect of a partial birth abortion statute, not materially different than those here at issue, would be to ban the most common and safest method of abortion in the second trimester, because the language of the statutes could extend to ban conventional D & E procedures as well as the intact D & E procedure. *See, e.g., Women's Medical,* 130 F.3d at 200–01; *Hope Clinic,* 995 F.Supp. at 848; *Evans,* 977 F.Supp. at 1318; *Woods,* 982 F.Supp. at 1372–73. Under both *Casey* and *Danforth,* this result is unconstitutional.[40]

■■■ On this record, and in light of decisions in similar cases, the plaintiffs have established a likelihood of success under *Direx Israel* that, without a maternal health exception, the Act places an undue burden on a woman's right to seek an abortion pre-viability because it has the effect of subjecting women to an appreciably greater risk of injury or death than would be the case if these women could rely upon their physician to perform their method of the D & E procedure. In fact, as is true on their vagueness challenge, the plaintiffs have satisfied, on the undue burden issue, the more stringent "substantial likelihood of success" standard.

### 4. The Public Interest

The final factor in the preliminary injunction inquiry is a determination of "[w]herein lies the public interest." *Blackwelder,* 550 F.2d at 197 (quoting *Airport Comm'n of Forsyth County, N.C. v. C.A.B.,* 296 F.2d 95, 96 (4th Cir.1961)); *see Direx Israel,* 952 F.2d at 814. Although not always "considered at length in preliminary injunction analyses," *Rum Creek,* 926 F.2d at 366, this facet of the test is nonetheless an important aspect of the preliminary injunction calculus. *See Multi–Channel TV Cable Co. v. Charlottesville*

*Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994); *X Corp. v. Doe,* 805 F.Supp. 1298, 1311 (E.D.Va.1992), *aff'd sub nom. Under Seal v. Under Seal,* 17 F.3d 1435 (4th Cir.1994).

Depending upon the context of a particular case, "[p]ublic interest can be defined a number of ways." *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 197 (3d Cir.1990). This case implicates competing interests, both of which are essential to our notions of liberty and government. On the one hand is the right of a woman—defined in *Roe* and *Casey* and guarded against invasion by the Fourteenth Amendment—to choose to have an abortion before fetal viability without undue burden levied by the State, and the right to obtain a post-viability abortion if her life or health is jeopardized. Also at stake is the concomitant right of physicians to provide medical services and advice in accord with sound medical practice, holding the patient's health and life in the highest regard, free from fear of unwarranted State prosecution. Standing in juxtaposition to these important interests is the right of the State through democratic action, as embodied in its legislative process, to protect its "profound interest in potential life." *Casey,* 505 U.S. at 837, 112 S.Ct. 2791.

Where, as here, "[b]oth ... parties assert basic rights fundamental to our nation," the Court faces the arduous task of "ascertain[ing] where the public interest rests." *Rum Creek,* 926 F.2d at 353 (quoting *Virginia Chapter, Associated Gen. Contractors v. Kreps,* 444 F.Supp. 1167, 1185–86 (W.D.Va. 1978)). Of course, the Court must be keenly aware of considerations of comity and federalism that necessarily are in tension anytime a federal court is called upon to "interpose[s] [the exercise of federal power] into the democratic processes of" the State. *Camblos,* 116 F.3d at 721.[41] In that regard, our constitu-

---

**40.** In *Planned Parenthood of Wisconsin v. Doyle,* —— F.Supp.2d —— (W.D.Wis.1998), the court found no undue burden in the Wisconsin statute which, as interpreted by the court, banned only the "intact D & E" (*i.e.* the D & X) procedure because "[a]bsent from the record is a showing that intact D & E's are safer in any significant way from conventional D & E's." (p. 25) That reasoning does not apply to the facts presented on the undue burden issue in this case. Moreover, the record here contains significant evi-

dence that the D & X procedure is often far safer than other D & E procedures. Hence, *Doyle* is not appropriate to this case.

**41.** *Camblos* does not mention *Blackwelder, Direx Israel,* or *Rum Creek.* Further, *Camblos* notes: "[o]nce it is apparent that plaintiff cannot show a substantial likelihood of prevailing on the merits of these claims, however, it is apparent that the particular balance of harms undertaken by the court was necessarily in error." *Camblos,* 116

tion has established a federalist system of government in which the federal government, although "anxious ... to vindicate and protect federal rights and federal interests," must "always endeavor[ ] to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Nowhere is that principle more important to the successful operation of our form of government than where the federal judiciary is called upon to enjoin enforcement of a statute through which the legislature has voiced the will of the State's citizens.

■ Mindful of Virginia's portentous interest in its democratic processes and in the enforcement of its laws, the Court must, at the same time, faithfully "adher[e] to the ... duty ... of the Federal courts to protect the citizens of the United States, and of every state, in the enjoyment of rights and privileges guaranteed by the Federal Constitution." *Deposit Bank of Frankfort v. Board of Councilmen*, 191 U.S. 499, 518, 24 S.Ct. 154, 48 L.Ed. 276 (1903). *Cf. Hicks v. Miranda*, 422 U.S. 332, 355, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (Marshall, J. dissenting) ("[T]here can be no doubt that the federal courts are 'the primary and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States.'") (quoting Frankfurter & Landis, *The Business of the Supreme Court: A Study in the Federal Judicial System* 65 (1927)). When a court is confronted with "grave or serious questions," an important aspect in assessing a motion for preliminary relief is the need to "maintain the *status quo ante litem*, provided that it can be done without imposing too excessive an interim burden upon the defendant." *Feller v. Brock*, 802 F.2d 722, 727 (4th Cir.1986) (quoting *Blackwelder*, 550 F.2d at 195, 196); *see also Mom N Pops, Inc. v. City of Charlotte*, 979 F.Supp. 372, 395 (W.D.N.C.1997) ("The general desideratum is whether and to what extent the public interest lies in preserving

the *status quo ante litem* until the merits of a serious controversy can be fully considered by a trial court.") (quoting *Blackwelder*, 550 F.2d at 197). " '[P]reservation of the *status quo*,' however, does not symbolize an additional test." *Rum Creek*, 926 F.2d at 360. Rather, the *status quo* assessment is part of the public interest facet of the *Blackwelder* test.

■ "The '*status quo*' does not 'consist of a photographic replication of the circumstances existing at the moment suit was filed,' but rather 'the last peaceable uncontested status that existed before the dispute arose.'" *Faulkner v. Jones*, 10 F.3d 226, 237–38 (4th Cir.1993) (Hamilton, J. dissenting) (quoting *Massachusetts Mut. Life Ins. v. Associated Dry Goods Corp.*, 786 F.Supp. 1403, 1427 (N.D.Ind.1992)); *see Stemple v. Board of Educ.*, 623 F.2d 893, 898 (4th Cir. 1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

■ Here, the last peaceable uncontested status before the dispute arose was the provision and receipt of abortions within the parameters set by Virginia's abortion statutes and the principles set forth by *Roe* and *Casey*. That status will be altered if the Act takes effect on July 1, 1998. And, when that status is disturbed, the record demonstrates that irreparable injury will befall the plaintiffs and their patients. That injury will be effected by a statute, the scope and meaning of which not even counsel for the State and its expert witness can agree. The alteration in status, and the ensuing injury, will be accomplished by virtue of statutory language, which, in the same or similar iteration, thirteen of fourteen courts (both state and federal) have found constitutionally wanting. Viewing the factual record against the backdrop of this overwhelming and persuasive quantum of authority, the Court does not consider that it is acting upon a "palpable misunderstanding" of controlling abortion jurisprudence. *Camblos*, 116 F.3d at

F.3d at 721. Hence, it is possible to interpret the *Camblos* opinion to mean that, in constitutional challenges to State statutes, preliminary injunctive relief should not be granted absent a substantial likelihood of success on the merits of the constitutional issue. A rule of that sort might well be appropriate, but it would be a significant

departure from current Fourth Circuit jurisprudence, in particular *Rum Creek*. It is therefore not a matter for this Court. If, however, the *Camblos* decision has effected such a shift, the plaintiffs here have shown a substantial likelihood of success on the merits of their constitutional challenges.

721. Under these circumstances, it cannot be said that the *status quo* analysis is governed by the stay opinion in *Camblos*, 116 F.3d at 721. Accordingly, in this case, the *status quo* is maintained not by allowing the Act to take effect, but by forestalling its application for a brief period of time until the issues presented can be adjudicated on their merits. Thus, the public interest favors issuance of a preliminary injunction for "the public is certainly interested in the prevention of enforcement of [laws] which may be unconstitutional." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir.1987); *see Frye v. United States*, 916 F.Supp. 546, 548 (M.D.N.C.1995).

## CONCLUSION

For the foregoing reasons, the plaintiffs are entitled to preliminary injunctive relief. The injunction, of course, must be tailored to impose the least necessary restriction on the defendants. Taking into account the ambiguity in the statutory terms and the fact that the defendants are unwilling to agree that the suction curettage and D & E procedures, as performed by the plaintiffs, are excluded from the reach of the Act, it is necessary to prohibit enforcement of the Act against the plaintiffs or their patients until the issues can be resolved on their merits. That conclusion also takes into account the nature of the injury likely to be sustained by plaintiffs and their patients, absent such an injunction, and the lack of harm to the defendants as well as their unencumbered ability to enforce Virginia's existing abortion regulations.

The appended Order of Preliminary Injunction is part of this Memorandum Opinion.

The Clerk is directed to send a copy of this Memorandum Opinion and the appended Order to all counsel of record.

It is so ORDERED.